**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 27, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GARY D. BLEHM,

      Plaintiff - Appellant,

v.

ALBERT A. JACOBS; JOHN JACOBS;
THE LIFE IS GOOD COMPANY, f/k/a
LIFE IS GOOD, INC.; LIFE IS GOOD
WHOLESALE, INC.; and LIFE IS
GOOD RETAIL, INC.,

      Defendants - Appellees.

No. 11-1479

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:09-CV-02865-RPM)**

---

Conor F. Farley (Stephen G. Masciocchi, with him on the briefs), Holland & Hart LLP, Denver, Colorado, appearing for Appellant.

Natalie Hanlon-Leh (Jared B. Briant, Joel D. Sayres, and Katie R. Schwalb, with her on the brief), Faegre Baker Daniels LLP, Denver, Colorado, appearing for Appellee.

---

Before **BRISCOE,** Chief Judge, **GORSUCH,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

Appellant Gary Blehm brought this copyright infringement action against brothers Albert and John Jacobs and the Life is Good Company (collectively "Life is Good").[1] Mr. Blehm is the creator of copyrighted posters featuring cartoon characters called "Penmen." He contends that numerous Life is Good depictions of a cartoon character called "Jake" infringe on his copyrighted works. The district court granted Life is Good's motion for summary judgment, holding that no infringement occurred because the copyrighted and accused works are not substantially similar.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual Background*[2]

#### 1. *Development and Distribution of Mr. Blehm's Copyrighted Works*

Mr. Blehm is a commercial artist who lives in Colorado Springs, Colorado. In the late 1980s, he developed characters called "Penmen." According to Mr. Blehm, each Penman is "a deceptively-simple looking figure" that "engage[s] in a variety of activities pulled directly from [his] colorful life experiences." Aplt. Br. at 2. The Penmen have "round heads, disproportionately large half-moon smiles, four fingers, large feet,

---

[1] The company's official name is "Life is good Company," with a lowercase "g." We capitalize "Good" throughout this opinion for ease of reading.

[2] In reviewing the district court's grant of summary judgment, we recite the evidence in the light most favorable to Mr. Blehm, the nonmoving party. *See Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1169 (10th Cir. 2010).

disproportionately long legs, and a message of unbridled optimism." *Id.* at 3. Below is an example of a Penman.



The Penmen are a product of Mr. Blehm's commercial art training. Through his training, Mr. Blehm learned how to "add a slight bend to a figure's limb to show weight bearing into it" and how, as he puts it, to apply negative space. Aplt. Appx., Vol. 2 at 539. Eventually, Mr. Blehm developed rules and guidelines for drawing each Penman. These rules and guidelines include a specific shape for each Penman's head, specific length and height requirements for each character, rules on fluidity and perspective, and the "Penmen parallel curve," which Mr. Blehm employs to "create eye-pleasing shapes within the negative space." *Id.* at 540.

Between 1989 and 1993, Mr. Blehm developed six posters featuring Penmen and registered them with the U.S. Copyright Office (the "copyrighted works").[3] Each poster

---

[3] Mr. Blehm registered six works with the U.S. Copyright Office. The six works are:

- Poster C001, "Find the Two Identical Penmen," Registration No. VA 368 815 (Aug. 7, 1989), for "Cartoon Character Designs";
- Poster A001, "Find the Fore Identical Penmen," Registration No. VA 437 346 (Nov. 26, 1990), for "Modern Art Game";
- Poster C009, "Find the Fore Identical Penmen," Registration No. VA 607 539 (Aug. 16, 1993), for "Visual Art Puzzle";

Continued . . .

contains hundreds of black-and-white Penmen in a variety of poses.  The Penmen are arranged on the posters in multiple rows with consistent spacing.  Many of the characters interact with one another, and some have only slight differences.  The posters, some of which have golf or galactic themes, challenge purchasers to find identical Penmen within each poster.

In 1990, Mr. Blehm began selling his posters to distributors.  From 1990 to 2004, Prints Plus sold his posters nationally.  Prints Plus stores in the Cambridgeside Galleria and the Emerald Square Mall, both in the Boston area, displayed his posters prominently and found them to be best-sellers during the holiday season.  In the early 90s, Mr. Blehm began selling his posters to Image Conscious, which distributed Mr. Blehm's posters to stores across the country, including some in the Boston area.  Starting in October 1991, McGaw Graphics sold Mr. Blehm's posters to numerous Boston-area stores, including the Harvard Coop, a student bookstore in Harvard Square.

After experiencing success with the posters, Mr. Blehm expanded the Penmen line.  He began making Penmen t-shirts.  He developed a Penmen comic strip, which eventually was printed in newspapers with a combined circulation of over five million.

---

Cont.

- Poster D001, "Find the Two Identical Penmen," Registration No. VA 468 434 (Aug. 19, 1991), for "Art Game";
- Poster D002, "Find the Two Identical Penmen," Registration No. VA 482 967 (Dec. 19, 1991), for "Art Game"; and
- Poster C005, "Find the Two Identical Space Penmen," Registration No. VA 600 649 (Sept. 20, 1993), for "Visual Art Puzzle."

Mr. Blehm also created a Penmen book, which is sold nationally.

2. *The Jacobs Brothers, Life is Good, and the Development of "Jake"*

Starting in 1989, the Jacobs brothers designed and sold t-shirts "infused with a positive undertone as a reflection of their beliefs." Aplee. Br. 2. The brothers sold t-shirts in areas around Boston, including Harvard Square, not far from the Harvard Coop. During the 1993 holiday season, the Jacobses sold t-shirts from carts in the Cambridgeside Galleria and the Emerald Square Mall, both of which had Prints Plus stores that sold Mr. Blehm's posters.

According to the Jacobses, around April 1994 John Jacobs drew a sketch of a figure with a red face, wide smile, sunglasses, and a beret. The figure was enclosed in two circles. John hung the sketch on the wall of the brothers' apartment.

The Jacobses recall hosting a party in August 1994 at their apartment and soliciting feedback on the sketch from their friends. After a friend stated that the figure in the sketch "really has life figured out," John Jacobs wrote "Life is good" under the image. They named the image "Jake," a spinoff of their last name.

The Jacobses soon made and sold t-shirts featuring Jake at street fairs and to retailers. As demand for the shirts increased, John Jacobs added a torso, arms, and feet to the Jake head. Jake was portrayed engaging in simple activities, such as biking, hiking, golfing, and playing soccer. Below is an example of an early Jake image.



The Jacobses incorporated Life is Good in 1997 with the "overarching themes of optimism, simplicity, humor, and humility." Aplee. Br. at 5. In 2003, they hired Joseph Burke and William Gillis to help design shirts. Depictions of Jake have increased in complexity over the years—from Jake engaging in simple poses to Jake engaging in actions and wearing clothes.

The Jacobses, Mr. Burke, and Mr. Gillis contend they had never heard of the Penmen before Mr. Blehm's lawsuit.

B. *Procedural History*

In December 2009, Mr. Blehm filed a complaint against the Jacobses and Life is Good alleging four causes of action. The complaint was later amended to allege one count of copyright infringement and one count of contributory infringement, claiming that various Life is Good Jake images infringed Mr. Blehm's copyrighted works.

In April 2011, Life is Good moved for summary judgment on three bases. First, Life is Good argued it had provided evidence that the accused Jake images had been independently created, thus negating any evidence that the company had copied from Mr. Blehm's posters. Second, it argued that Mr. Blehm had failed to show that Life is Good had access to the copyrighted works to copy them. Finally, it argued that the Jake images are not substantially similar to the copyrightable elements of Mr. Blehm's works.

The district court held that material factual disputes precluded summary judgment on Life is Good's assertion that the Jake images had been independently created. The court also held that Mr. Blehm had provided sufficient evidence that the Jacobses had access and opportunity to copy the Penmen posters. However, the district court granted summary judgment to Life is Good and dismissed Mr. Blehm's infringement claims because the Jake images are not substantially similar to the legally protectable elements of the Penmen images.

Mr. Blehm filed a timely appeal from the summary judgment order.

## II. DISCUSSION

"To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 942 (10th Cir. 2002). Because Life is Good does not dispute that Mr. Blehm owns a valid copyright in the Penmen posters, only the second element, copying, is at issue.

The copying element of an infringement claim has two components. *See Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B] (2010) (hereinafter "Nimmer"). First, a plaintiff must demonstrate that the defendant copied the plaintiff's work "as a factual matter." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 832 (10th Cir. 1993). Second, the plaintiff must establish "substantial similarity"

between the allegedly infringing work and the elements of the copyrighted work that are legally protected. *Jacobsen*, 287 F.3d at 942-43. This second component, which is a mixed question of law and fact, determines whether a defendant's factual copying constitutes actionable infringement. *See id.* at 942; 4 Nimmer § 13.01[B] (explaining that a finding of factual copying "does not vouchsafe resolution of the legal question whether such copying . . . gives rise to liability for infringement").

Mr. Blehm argues that the district court erred in granting summary judgment to Life is Good on the basis that the legally protectable elements of his copyrighted works are not substantially similar to the accused Jake images. If we agree with Mr. Blehm, Life is Good urges that we affirm the grant of summary judgment on either of two alternative grounds: (1) Life is Good presented unrebutted evidence of the independent creation of Jake, or (2) Mr. Blehm failed to provide evidence that Life is Good copied the Penmen as a factual matter.

"We review the . . . grant of summary judgment de novo, applying the same standard as the district court." *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1268 (10th Cir. 2012), *as amended on denial of reh'g* (June 28, 2012). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e view all facts and evidence in the light most favorable to the party opposing summary judgment." *Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012).

After a de novo review of the substantial similarity between the protectable

-8-

elements of the Penmen and the accused Life is Good images, we affirm the district court's ruling that the copyrighted and accused works are not substantially similar. We therefore need not address Life is Good's proposed alternative bases for affirmance.

A. *Substantial Similarity*

1. *Legal Framework*

"In order to prove copying of legally [protectable] material, a plaintiff must typically show substantial similarity between legally [protectable] elements of the original work and the allegedly infringing work." *Jacobsen*, 287 F.3d at 942-43. This commonly stated rule raises two questions: First, what elements of a copyrighted work are legally protectable? Second, how do courts determine whether a copyrighted work's legally protectable elements are "substantially similar" to an accused work?

a. *Legally Protectable Elements: The Idea/Expression Distinction*

Section 102(a) of the Copyright Act states that a copyright protects the "original works of authorship fixed in any tangible medium of expression," including pictorial and graphic works. 17 U.S.C. § 102(a). To gain protection, the work must demonstrate "at least some minimal degree of creativity," but "even a slight amount will suffice." *Feist*, 499 U.S. at 345. "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." *Id.* (quotations omitted).

But legal protection does not extend to all aspects of a copyrighted work. *Id.* at 348 ("The mere fact that a work is copyrighted does not mean that every element of the

work may be protected."). Section 102(b) provides, "In no case does copyright protection . . . extend to any idea . . . [or] concept . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b). This provision enshrines the "fundamental tenet" that copyright "protection extends only to the author's original expression and not to the ideas embodied in that expression." *Gates Rubber Co.*, 9 F.3d at 836; *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985) (explaining that copyright protection extends only to "those aspects of the work—termed 'expression'—that display the stamp of the [plaintiff's] originality"); *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992) ("[I]n looking at . . . two works of art to determine whether they are substantially similar, focus must be on the similarity of the *expression* of an idea or fact, not on the similarity of the facts, ideas or concepts themselves.").

Thus, courts comparing works must first distill the protectable elements of the copyrighted work—i.e., determine what aspects constitute protectable expression. *See Jacobsen*, 287 F.3d at 943 n.5; *Country Kids*, 77 F.3d at 1284-85 ("[W]e separate the ideas . . . which are not protectable, from the particular expression of the work.").[4] But

---

[4] At times, we have used an "abstraction-filtration-comparison" approach to aid our substantial similarity inquiry. *See Jacobsen*, 287 F.3d at 943 n.5. At the abstraction step, the court identifies unprotected elements of a copyrighted work. *See Gates Rubber*, 9 F.3d at 834. We then filter out unprotected elements from the author's protected expression. *Id.* Finally, we compare the remaining protected expression with the allegedly infringing work. *Id.* We originally found this analysis "especially well suited

Continued . . .

this process, "although sound in theory, is difficult to apply in practice." *Country Kids*,

77 F.3d at 1285. More than 50 years ago, Judge Learned Hand recognized that "[t]he test

for infringement of a copyright is of necessity vague." *Peter Pan Fabrics, Inc. v. Martin*

*Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960); *see also Nichols v. Univ. Pictures Corp.*,

45 F.2d 119, 122 (2d Cir. 1930) (explaining that drawing the line between what is

protected and what is not "will seem arbitrary, [but] that is no excuse for not drawing it").

Because "no principle can be stated as to when an imitator has gone beyond copying the

'idea,' and has borrowed its 'expression[,]' [d]ecisions must therefore inevitably be ad

hoc." *Peter Pan Fabrics,* 274 F.2d at 489. We follow this case-by-case approach, *see*

*Country Kids*, 77 F.3d at 1286-87; *Gates Rubber*, 9 F.3d at 836, and are mindful "that

copyright law seeks to achieve a proper balance between competition based on public

ideas and incentive to produce original work," *Country Kids*, 77 F.3d at 1285.

Because the idea/expression distinction is "the most complex part of the

substantial similarity inquiry," *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film,*

---

Cont.

to the dissection of computer programs because the test breaks down a program in a way that parallels the typical development of a program." *Id.*

But "not every case requires extensive analysis," and the appropriate test "may vary depending upon the claims involved, the procedural posture of the suit, and the nature of the works at issue." *Jacobsen*, 287 F.3d at 943 n.5 (quotations omitted). Here, the visual works are relatively simple. Although we do not use the abstraction-filtration-comparison analysis, our goal is the same: separating unprotectable ideas from protectable expression in Mr. Blehm's copyrighted works and comparing the remaining protectable expression to the Life is Good images to determine whether they are substantially similar.

*Corp.*, 361 F.3d 312, 318 (6th Cir. 2004), we discuss a few examples where courts have separated the two. In *Country Kids*, this court held that copyright protection did not "extend to the size, shape and medium" of wooden dolls. 77 F.3d at 1285. We explained that the Copyright Act is concerned with artistic innovation and excludes protection for a work's "utilitarian qualities." *Id.* at 1287. The idea of a wooden doll is not copyrightable, nor are "any basic and utilitarian aspects of the dolls, such as the shape of a human body and standard . . . doll poses which are both friendly and inviting and also utilitarian in their ease of manufacture and adaptability to the attachment of various wardrobes." *Id.*

Similarly, a copyright owner has no monopoly over the idea of "fashion dolls with a bratty look or attitude, or dolls sporting trendy clothing." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 916 (9th Cir. 2010), *as amended on denial of reh'g* (Oct. 21, 2010). Nor does copyright protection extend to the idea of creating a doll with "an upturned nose, bow lips, and widely spaced eyes," even if the allegedly infringing work has explicitly taken this idea from the copyrighted work. *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 136 (2d Cir. 2004).

Copyright instead protects the "particularized expression" of the idea of a doll with such features. *Id.* For example, although a copyright owner has no monopoly over the idea of a muscular doll in a standard pose, the owner may have a valid infringement claim for copying of the "particularized expression of that idea," such as "the decision to accentuate certain muscle groups relative to others." *Mattel, Inc. v. Azrak-Hamway Int'l,*

*Inc.*, 724 F.2d 357, 360 (2d Cir. 1983). A copyright owner's original stylistic choices qualify as protectable expression if the choices are not dictated by the underlying idea. *See Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 901 (9th Cir. 1987) (stuffed dinosaur toys cannot be substantially similar because of shared physiognomy, but a distinctive "eye style and stitching" could qualify as protectable expression if they are "not dictated by the idea of stuffed dinosaur dolls").

In architecture, there is no copyright protection for the idea of using "domes, wind-towers, parapets and arches." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1297 (D.C. Cir. 2002). "[T]o hold otherwise would render basic architectural elements unavailable to architects generally, thus running afoul of the very purpose of the idea/expression distinction: promoting incentives for authors to produce original work while protecting society's interest in the free flow of ideas." *Id.* On the other hand, the combination of common architectural elements and use of specific designs may constitute original expression that is protected. *Id.* An architectural design may infringe if its use of public-domain elements gives off a similar unique effect in decoration and design as the copyrighted work. *See id.* at 1298-99.

Thus, a sweater designer can have copyright protection over an original way of using squirrels as a design element in conjunction with fall colors, stripes, and panels, even though those elements individually constitute ideas in the public domain. *See Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995). A plaintiff's "selective and particularized" alterations of a public-domain carpet pattern also can

-13-

constitute protectable expression. *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 136 (2d Cir. 2003).

Even factual compilations may contain protectable expression. In *Feist*, the Supreme Court explained that facts themselves "are not original and therefore may not be copyrighted," but that copyright does protect "an original selection or arrangement of facts." 499 U.S. at 350. In that case, the plaintiff's compilation of facts in a telephone directory "lack[ed] the modicum of creativity necessary to transform mere selection [of facts] into copyrightable expression." *Id.* at 362.

Having addressed the "vital distinction" between ideas and expression, *Murray Hill*, 361 F.3d at 318, we next discuss the test for determining when a copyrighted work's protectable expression is substantially similar to an accused work.

### b. *Test for Substantial Similarity: The Ordinary Observer*

Once a court has distinguished between unprotected ideas and protected expression in a copyrighted work, it must determine whether the protected elements are substantially similar to the accused work. *See Country Kids*, 77 F.3d at 1287. This "is primarily a qualitative rather than a purely quantitative analysis and must be performed on a case-by-case basis." *Gates Rubber Co.*, 9 F.3d at 839 (citation omitted).

Courts must determine "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's [protectable] expression by taking material of substance and value." *Country Kids*, 77 F.3d at 1288 (quotations omitted). Stated somewhat

-14-

differently, the substantial similarity test asks "whether the ordinary observer, unless he set out to detect the disparities [between the works], would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* (quotations omitted). The proper focus is on the similarities between the works, not their minute differences. *Id.*

In *Jacobsen*, we asked whether the defendant's alleged copying of the plaintiff's copyrighted memoir was "so minor as to be beyond the outer limits of substantial similarity." 287 F.3d at 947. We have not defined the "outer limits" of substantial similarity, likely because the line between substantial similarity and no substantial similarity is imprecise. *See Peter Pan Fabrics*, 274 F.2d at 489 ("The test for infringement of a copyright is of necessity vague."). Nimmer explains that summary judgment for the defendant is appropriate if the court "determines that any similarity between the works is insubstantial." 3 Nimmer § 12.10[B][3]. Put somewhat differently, a court may grant summary judgment for the defendant if the protectable expression in the copyrighted work and the allegedly infringing work is "so dissimilar . . . that no reasonable jury could find for the plaintiff on the question of substantial similarity." *Sturdza*, 281 F.3d at 1297; *see also Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986) ("[W]e must decide whether the lack of substantial similarity between the [protectable] aspects of the works was so clear as to fall outside the range of disputed fact questions requiring resolution at trial." (quotations omitted)); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 (9th Cir. 1983) ("[S]ummary judgment for defendant is appropriate where works are so dissimilar that a claim of infringement is

-15-

without merit.").

## 2. *Comparing the Penmen and Jake Images*

Mr. Blehm asserts that the district court's substantial similarity analysis excluded

protected expression from the Penmen and focused on differences between the Penmen

and Jake images rather than similarities. When his works' expression is considered and

compared to the Jake images for similarities, Mr. Blehm argues, a reasonable jury could

determine that Life is Good unlawfully appropriated protectable expression by taking

material of substance and value.[5]

The district court viewed the Penmen as "simple" stick figures and explained that

_____

[5] As an alternative basis for its summary judgment ruling, the district court explained that "[i]t is beyond dispute that a poster depicting hundreds of small Penmen characters engaged in various activities is not substantially similar to a tee-shirt with a single stick figure image portrayed on it." Aplt. Appx. at 1217. Mr. Blehm asserts that the district court erred in first comparing the copyrighted posters as a whole with each individual Jake image on a Life is Good t-shirt.
　　　We agree with Mr. Blehm that the district court's analysis on this point was incorrect. The ordinary observer test asks "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's . . . expression by taking material of substance and value." *Jacobsen*, 287 F.3d at 943 (quotations omitted). A defendant may be liable for infringement for copying pieces of the plaintiff's copyrighted work if those pieces constitute "a substantial portion of plaintiff's work." *Id.* at 945 (quotations omitted).
　　　Under this framework, the proper analysis is to compare the accused Jake images with the Penmen to determine whether Life is Good appropriated Mr. Blehm's protectable expression by taking material of substance and value. If so, the next question is whether that appropriation constitutes a substantial portion of Mr. Blehm's copyrighted posters. *See id.* at 948 (instances of copying from plaintiff's memoir were numerous enough to preclude Rule 12(b)(6) dismissal).
　　　Nevertheless, the district court also compared individual Penmen to individual Jake images, as Mr. Blehm requested, and determined that Life is Good did not appropriate protectable expression. We affirm on this alternative basis.

any similarities between them and the Jake images "result[]from common themes and general concepts such as the idea of a person skateboarding, playing [F]risbee, playing a musical instrument, holding a birthday cake, roasting a marshmallow over a campfire, or holding his hand in a peace sign." Aplt. Appx. at 1219. These themes, the court noted, are unprotected ideas. It further explained that no copyright protection extends to Penmen poses that flow from the described activities, or to anatomical similarities between the Penmen and Jake images.

After parsing out these elements, the district court concluded that "the remaining original expression [of the Penmen] that is subject to protection is thin." *Id.* It determined that the Penmen and Jake images are different "with respect to color, the orientation of the body, the relation of the body to the head, expression, clothing and other features," and that any similarities "flow from considerations external to the Plaintiff's creativity, such as common themes and natural poses." *Id.* at 1219-20.

The district court was correct that Mr. Blehm has no copyright over the idea of a cartoon figure holding a birthday cake, catching a Frisbee, skateboarding, or engaging in various other everyday activities. Nor can the Jake images infringe on the Penmen because the figures share the idea of using common anatomical features such as arms, legs, faces, and fingers, which are not protectable elements. *See Baby Buddies, Inc. v. Toys "R" Us, Inc.*, 611 F.3d 1308, 1317 (11th Cir. 2010) (no copyright protection over common anatomical features of teddy bear); *Goldberger*, 365 F.3d at 136 (copyright in Barbie doll cannot "prevent a competitor from making dolls with upturned noses, bow

-17-

lips, and widely spaced eyes"). Mr. Blehm's copyright also does not protect Penmen

poses that are attributable to an associated activity, such as reclining while taking a bath

or lounging in an inner tube. *See Aliotti*, 831 F.2d at 901 n.1 (no protection in common

dinosaur pose of open mouth); *Azrak-Hamway Int'l*, 724 F.2d at 360 (no protection over

figurine's "traditional fighting pose"). These everyday activities, common anatomical

features, and natural poses are ideas that belong to the public domain; Mr. Blehm does

not own these elements. *See Goldberger*, 365 F.3d at 136.

Although we do not consider these unprotected elements in our substantial

similarity analysis, we acknowledge that Mr. Blehm's works do contain some protectable

expression.[6] The Penmen at first glance might be considered simple stick figures, but

---

[6] The district court characterized any remaining expression in Mr. Blehm's works as "thin." Aplt. Appx. at 1219. This may be a reference to the Supreme Court's decision in *Feist*, in which the Court addressed copyright protection in a telephone directory and explained that "copyright in a factual compilation is thin." *Feist*, 499 U.S. at 349. We discussed "thin" protection in *TransWestern Publishing Co. v. Multimedia Marketing Associates, Inc.*, 133 F.3d 773, 776 (10th Cir. 1998), in the context of a similar telephone directory. But unlike the fact-based works in *Feist* and *TransWestern*, Mr. Blehm's works are pictorial. *See Jacobsen*, 287 F.3d at 944-45 (limiting thin protection to fact-based works with little creative effort).

"Thin" protection has come up outside the context of fact-based works. The Ninth Circuit distinguishes between works entitled to "broad" protection and those with "thin" protection. *See MGA Entm't*, 616 F.3d at 913-14. "If there's a wide range of expression (for example, there are gazillions of ways to make an aliens-attack movie), then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work." *Id.* But "[i]f there's only a narrow range of expression (for example, there are only so many ways to paint a red bouncy ball on a blank canvas), then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." *Id.* at 914.

Even assuming the distinction between "broad" and "thin" protection is correct, Mr. Blehm's works would not necessarily fall in the "thin" protection category. There
Continued . . .

they are more nuanced than a child's rudimentary doodling.  For example, the prototypical Penman has a rounded, half-moon smile that takes up a substantial portion of the face.  Mr. Blehm has chosen to omit any other facial features on the Penmen.  Each figure is filled in black, except for the white half-moon smile, and each Penman's head is detached, hovering above the body.  Many of the Penmen stand facing the viewer, flashing the half-moon smile.

Mr. Blehm also drew the Penmen according to his own rules and guidelines.  The figure's head might be perceived as slightly disproportional to the body.[7]  Its arms and legs are thin, long, and disproportionate to the torso, which is relatively short.  Mr. Blehm also chose to give the Penmen four fingers—each about as thick as their arms and legs—on each hand, as well as feet that are disproportionately long and thick compared with the rest of the body.

Thus, each Penman reflects particular stylistic choices Mr. Blehm has made.  It is likely that these stylistic choices contributed substantially to the success of his

---

Cont.

are many ways to depict a cartoon figure catching a disc or golfing, just as there are many ways—from Odie to Snoopy—of drawing a cartoon dog.

In any event, we do not read the district court's reference to "thin" protection as requiring Mr. Blehm to show a heightened degree of similarity between the copyrighted and accused images.

[7] Mr. Blehm asserts that the Penman head is disproportionately large.  *See* Aplt. Br. at 34.  This is arguably correct, but the Penman's head is plainly not as disproportionate as the typical Jake figure's head.

copyrighted works.  *See Goldberger*, 365 F.3d at 136 ("We can surmise that in the highly competitive, billion-dollar doll industry, getting the doll's face and expression exactly right is crucial to success.").  Although some may discount Mr. Blehm's drawings as simple stick figures, we are mindful that each Penman follows a seemingly uniform standard to achieve a unique expression.  We also are cognizant that under the law of copyright, "even a modicum of creativity may suffice for a work to be protected." *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 908 (3d Cir. 1975); *see Feist*, 499 U.S. at 345.  Mr. Blehm's works easily clear that threshold.

Having identified protectable expression in Mr. Blehm's drawings, we must determine whether that expression is substantially similar to the allegedly infringing Life is Good images.  Life is Good is not entitled to summary judgment unless its Jake figures are so dissimilar from the protectable elements of the Penmen that no reasonable jury could find for Mr. Blehm on the question of substantial similarity.  *See Sturdza*, 281 F.3d at 1297.

To show substantial similarity, Mr. Blehm provided the district court with an exhibit juxtaposing 67 individual Penmen with a corresponding, allegedly infringing Jake image.  We have reviewed these images and agree with the district court's grant of summary judgment in favor of Life is Good.  We now address two of Mr. Blehm's proposed comparisons, which he highlights in his appellate brief, and explain why the Life is Good images are so dissimilar from the protectable elements of Mr. Blehm's images that no reasonable jury could find in his favor.

-20-

a. ***The Peace Sign Images***



The first example in Mr. Blehm's exhibit juxtaposes a Penman and Jake image standing and displaying the peace sign. Because we must separate unprotected ideas from expression, our analysis does not consider that both drawings share the idea of a cartoon figure making a common hand gesture. But we do consider whether the Jake image is substantially similar to Mr. Blehm's expression of this idea.

Mr. Blehm urges us to find certain similarities between the images. He notes that both have round heads. *See* Aplt. Br. at 22. But Mr. Blehm has no copyright protection in general human features. Further, the figures' heads are not similarly round. Jake's head is more oval and somewhat misshapen, whereas the Penman's head is circular and uniform.

Mr. Blehm suggests that the figures have similar proportions, such as the size of the figures' heads, arms, legs, and feet compared with their bodies. A close review of the figures, however, yields the opposite conclusion. Jake's head is very large compared with the body, while the Penman's head is relatively proportional. The Penman's arms and legs are long and disproportionate to its truncated torso. Jake, on the other hand, has more proportional limbs compared with his torso. The figures' feet are distinctly

-21-

different: the Penman's are thick, long, and roll-shaped, but Jake's are shorter and triangular.

Nevertheless, there are some similarities between the Penman and Jake. Both have black-line bodies, four fingers, and large half-moon smiles, and their feet are pointed outward. But even these similarities have important differences, or are not protectable expression. For example, Jake's fingers appear stubbier. The choice to display the figures' feet outward also naturally flows from the common idea of drawing a two-dimensional stick figure and is thus unprotected.

The figures' smiles thus seem to be the crux of this litigation. The Penman and Jake both face the viewer with disproportionately large half-moon smiles. A smile can be drawn in various ways. Here, they share a crescent shape, but the idea of a crescent-shaped smile is unprotected. Rather, the expression of the smiles must be substantially similar and important to the overall work.

The Penman's smile is all white, as is Jake's. The smiles on both figures take up a large portion of the head. But the Penman's smile is rounded on the tips, whereas the tips of Jake's smile are sharper angled. Jake's smile, by virtue of the size of his head, is much larger compared with his body than is the Penman's. And although both smiles are white, the Penman's is set on an all-black head, making it appear different from Jake's, which is the *outline* of a smile on a white head with black sunglasses.

Indeed, Mr. Blehm's decision to omit eyes and other facial features on the Penman makes the figure susceptible to an interpretation that the Penman is not smiling at all.

One interpretation is that the white space on the head is not a smile, but is the Penman's face with no features. The black above the half-moon shape can be perceived as hair swooping down over the Penman's forehead. Thus, the Penman's lack of facial features make it susceptible to different interpretations.[8] The Jake figure is not susceptible to similar confusion.

Any similarity between smiles also is insubstantial in light of other differences between the figures. Jake's head is attached to the body, and his head is white and has black sunglasses. The Penman's head is detached and is black with no eyes. Jake sports a beret, and his whole figure is displayed on a color background, whereas the Penman has no headwear and is portrayed against a plain white background. The Jake image's arms are positioned differently from the Penman, with Jake's left arm curved, rather than sharp and angular. Mr. Blehm also chose a unique feature for the Penman's peace-sign expression—white space in the figure's hand—that the Jake image does not share.

We conclude that no reasonable juror could determine that the Jake figure is substantially similar to the *protected, expressive* choices Mr. Blehm used for the Penman figure.

---

[8] Our analysis of this Penman drawing does not imply that all Penmen are susceptible to confusion over the smile.

b. *The Frisbee Images*



In another example, a Penman and Jake attempt to catch Frisbees between their legs. The two figures' poses are similar—suspended in the air with legs outstretched and a hand descending to catch the disc—but we do not consider the pose in our analysis. Such a pose is common to this activity and is not protected expression. Again, the figures have large, half-moon smiles. And unlike the "peace sign" Jake, this Jake image has legs that are disproportionate to a truncated torso. The Penman's legs also are long with respect to the torso, but not as disproportionate as Jake's.

Jake's legs are curved, but the Penman's are straightened. The Jake image's head differs in the same important ways as in the "peace sign" images. Jake's arms appear to extend from his head, but the Penman's arms attach to the top of the torso. Jake's torso is much thinner (and disproportionately shorter) than the Penman's; Jake has three fingers on each hand (not four); and the Jake image, unlike the Penman image, incorporates color on the canvas and disc. Jake's feet are defined—toes and arches are visible—but the Penman's are not.

Although the images share a similar idea of catching a Frisbee between the legs, the protectable expression in the Penman is not substantially similar to the Jake image.

-24-

c. ***Other Images***

Mr. Blehm highlights 65 other Penmen as having been copied. Attached to this opinion is the "Penmen-Jake Chart" Mr. Blehm submitted to the district court in an effort to demonstrate substantial similarity.

We have reviewed these images, and an analysis similar to the discussion above applies. We need not describe their similarities and differences in detail here, other than to note that other Penman-Jake comparisons have even more substantial differences than the "peace sign" and "Frisbee catching" images described above. For example, many of the Jake images wear clothes when the Penmen do not.[9] Others are drawn in a more three-dimensional manner than the Penmen.[10] Some Jake and Penmen images do not even share the half-moon smile directed at the viewer.[11] Many Jake images have substantial use of color.[12]

In sum, these images are so dissimilar as to protectable expression that the substantial similarity question need not go to a jury.

∗  ∗  ∗

Mr. Blehm urges that we should focus on the images' similarities, not their

---

[9] *See, e.g.*, "Penmen-Jake Chart," figs. 2, 3, 6, 8, 11, 12, 14.

[10] *See, e.g.*, *id.* at figs. 5, 8, 20, 27, 53, 55.

[11] *See, e.g.*, *id.* at figs. 3, 6, 13, 14, 17, 28, 37, 44, 49, 59, 63, 65, 67.

[12] *See, e.g., id.* at figs. 5, 7, 8, 10, 11, 12, 27, 35, 41, 53, 54, 59, 62, 63, 65.

differences. He is correct that "[t]he touchstone of the [substantial similarity] analysis is the overall similarities rather than the minute differences between the two works." *Country Kids*, 77 F.3d at 1288 (quotations omitted). But this does not mean we merely look at the images, notice they are similar because they are cartoon figures with big smiles engaging in like activities, and end our substantial similarity analysis in Mr. Blehm's favor. Mr. Blehm's copyright protection lies in the *particular way* he chose to express these works. And we must be careful not to grant Mr. Blehm a monopoly over all figures featuring black lines representing the human form. Our analysis cannot be so generous as to sweep in all manner of stick figures as potentially infringing on his works.

As Nimmer explains, the substantial similarity inquiry is a problem of "line drawing." 4 Nimmer § 13.03[A]. Truer words could not have been spoken about this case. We have focused on the unique expression in Mr. Blehm's Penmen. Other than the half-moon smile—a feature among the figures that is similar, but not substantially so—we see insubstantial similarity in expression between the Penmen and Jake.

Copying alone is not infringement. The infringement determination depends on what is copied. Assuming Life is Good copied Penmen images when it produced Jake images, our substantial similarity analysis shows it copied ideas rather than expression, which would make Life is Good a copier but not an infringer under copyright law.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Life is Good.

# PENMEN - JAKE CHART

| | | |
|---|---|---|
| | | 1 |
| | | 2 |
| | | 3 |
| | | 4 |
| | | 5 |



| | | 6 |
| | | 7 |
| | | 8 |
| | | 9 |
| | | 10 |
| | | 11 |

| | | 12 |
| | | 13 |
| | | 14 |
| | | 15 |
| | | 16 |
| | | 17 |

| | | 18 |
| | | 19 |
| | | 20 |
| | | 21 |
| | | 22 |
| | | 23 |



24

25

26

27

28

29

| | | 30 |
|---|---|---|
| | | 31 |
| | | 32 |
| | | 33 |
| | | 34 |
| | | 35 |

| | | |
|---|---|---|
| | | 36 |
| | | 37 |
| | | 38 |
| | | 39 |
| | | 40 |
| | | 41 |



| | | 42 |
| | | 43 |
| | | 44 |
| | | 45 |
| | | 46 |
| | | 47 |

| | | 48 |
| | | 49 |
| | | 50 |
| | | 51 |
| | | 52 |
| | | 53 |



| | | |
|---|---|---|
| | | 54 |
| | | 55 |
| | | 56 |
| | | 57 |
| | | 58 |
| | | 59 |

| | | 60 |
|---|---|---|
| | | 61 |
| | | 62 |
| | | 63 |
| | | 64 |
| | | 65 |



| | | 66 |
| | | 67 |