**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 11, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PAYCOM PAYROLL, LLC; ERNEST
GROUP, INC.,

      Plaintiffs - Appellees,

v.

DAVID RICHISON; PERIOD
FINANCIAL CORPORATION, d/b/a
Period Payroll Services,

      Defendants - Appellants.

No. 13-6181

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:09-CV-00488-W)**

---

Drew T. Palmer, (Melanie Wilson Rughani with him on the briefs), of Crowe &
Dunlevy, Oklahoma City, Oklahoma, for Defendants-Appellants.

Robert E. Norman, of Cheek & Falcone, PLLC, Oklahoma City, Oklahoma,
for Plaintiffs-Appellees.

---

Before **BRISCOE,** Chief Judge, **MCKAY** and **PHILLIPS**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

This is a copyright infringement action involving computer software code. Pursuant to a consent decree, the district court appointed a special master to review the software and to opine on the issue of infringement. The special master found copyright infringement and submitted a report containing his analysis. The district court agreed with the special master that copyright infringement had occurred, adopted the special master's report, and ordered all copies of the infringing software destroyed. Defendants appeal from the district court's order. We have jurisdiction under 28 U.S.C. § 1291, and we vacate the district court's order and remand.

**I**

In the 1990s, David Richison began a payroll processing company in Oklahoma with his niece and nephew, Shannon and Chad Richison. The company was called Ernest Group, Inc., and it did business under the name Paycom Payroll (collectively, "Ernest Group"). During David's tenure at Ernest Group, he wrote two software programs for use at the company. He called the first program BOSS, and he assigned his authorship interest in BOSS to Ernest Group in 1999. He called the second program Independence.

Amidst a souring relationship between him and Chad, David left Ernest Group in 2001. David moved to Maryland, where he formed his own payroll

processing company called Period Financial Corporation ("Period"). At Period, David wrote a third program called Period Indy. Period Indy was based, at least in part, on Independence.

In May 2009, Ernest Group filed this action against David and Period. The complaint alleged, *inter alia*, that Period Indy infringed on Ernest Group's copyright in BOSS. Shortly after filing its complaint, Ernest Group registered a copyright in Independence by representing the program as a work for hire.

By 2011, David had written a fourth program, called Cromwell, which would become the new basis for Ernest Group's lawsuit. In August of that year, the parties settled and agreed to the entry of a consent decree. All of Ernest Group's claims were released, with the exception of its claim for injunctive relief based on copyright infringement. All rights to Independence were assigned to Ernest Group. And the parties agreed that the district court should appoint a special master "to review, analyze, and report to the Court concerning whether the 'Cromwell software program,' and/or any prior versions of it not previously destroyed, infringe upon 'Paycom BOSS' and/or 'Paycom Independence.'" Aplt. App. II at 566. In other words, the special master was to write a report opining on whether the fourth program infringed on the first or second. Then the district court should decide the issue by consulting the special master's report.

A dispute arose, however, as to which version of Cromwell should be the subject of the special master's analysis—the version filed under seal with the

3

district court in July 2011, or the most recent version. David argued for the latter; Ernest Group argued for the former. The district court agreed with Ernest Group, reasoning that the settlement agreement only contemplated the use of the version of Cromwell filed under seal.

As for which versions of BOSS and Independence the special master should analyze, there was no disagreement. Although the 1999 versions of BOSS and Independence were registered with the Copyright Office, the parties agreed that the 2001 versions of both programs should be the subject of the special master's analysis. For his part, David submitted two drafts of a proposed order appointing the special master, and both drafts indicated that the special master should use the 2001 versions of BOSS and Independence. The district court incorporated this proposal into its order appointing Kendyl Román as special master.

On August 6, 2012, Román filed his report with the district court. He concluded that Cromwell infringed on Ernest Group's copyright in both BOSS and Independence. In accordance with the consent decree, the report was filed under seal and designated for "Attorneys' Eyes Only."

After Román filed his report, David moved to lift the "Attorneys' Eyes Only" restriction. As the author of the software, David felt that if he had access to the report, then he could assist his attorney in reviewing the substance of the report. Ernest Group opposed David's motion. The district court denied the motion, explaining that "no grounds [were] advanced by [David] that would

4

justify [his] access to the Special Master's Report." Id. at 665.

David's attorneys filed their objections to Román's report on September 28, 2012. In it, they argued that Román's report failed to conduct the abstraction-filtration-comparison test, or at least to document his application of the test. See generally Mitel, Inc. v. Iqtel, Inc., 124 F.3d 1366, 1371 (10th Cir. 1997) (discussing the abstraction-filtration-comparison test). To a certain extent, Ernest Group agreed with David's attorneys' criticism, replying that "[t]he consensus among the parties' experts and the Master is that the Master could and/or should do more to explain, document, and establish the basis and support for his opinion." Aplt. App. II at 675. It was Ernest Group's position, then, that the district court should "resubmit this matter to the Master with instructions to review and respond in detail to the matters raised." Id. at 678.

Before the district court could resolve the dispute, Ernest Group mailed David's attorneys' objections directly to Román. David's attorneys called foul. They urged that Ernest Group had "irrevocably tainted the Master's neutrality" by exposing Román to David's attorneys' "highly critical evaluation of the Report." Id. at 685.

The district court declined to resubmit the issue to Román. Instead, the court ordered Ernest Group to offer a more substantive response to David's attorneys' critique of the report. Ernest Group complied, arguing that the report was accurate, thoroughly reasoned and explained, and should be adopted by the

5

court.

On July 25, 2013, the district court agreed with Román and found that Cromwell infringed on BOSS and Independence. Therefore, the court ordered that all copies and versions of Cromwell should be destroyed.

**II**

David raises four arguments on appeal. First, David argues that the district court should have lifted the "Attorneys' Eyes Only" restriction on Román's report. Second, David argues that Román erred by analyzing versions of BOSS and Independence which were never registered with the Copyright Office. Third, David argues that Román's report is inadequate and the software is not substantially similar. Fourth, if remand is necessary, David argues that a new special master should be appointed.

**A**

David's first argument is that the district court erred when it declined to lift the "Attorneys' Eyes Only" restriction on Román's report. According to David, notwithstanding his initial agreement to the restriction, the district court's failure to lift the restriction was a violation of his due process rights.

David agreed to the "Attorneys' Eyes Only" restriction in a consent decree. "[A] consent decree is afforded the same effect as any other judgment." Satsky v. Paramount Commc'ns, Inc., 7 F.3d 1464, 1468 (10th Cir. 1993). "If . . . the decree appealed from was assented to by the appellant, we cannot consider any

6

errors that may be assigned which were in law waived by the consent . . . . If all the errors complained of come within the waiver, the decree below will be affirmed." Pac. R.R. v. Ketchum, 101 U.S. 289, 290 (1879). As a result, David's argument boils down to whether he has a right to see Román's report that is so fundamental as to be unwaivable.

No fundamental right is at issue here. "The disclosure of confidential information on an 'attorneys' eyes only' basis is a routine feature of civil litigation involving trade secrets." In re City of New York, 607 F.3d 923, 935 (2d Cir. 2010) (citing Fed. R. Civ. P. 26(c)(1)(G)). "The purpose of this form of limited disclosure is to prevent a party from viewing the sensitive information while nevertheless allowing the party's lawyers to litigate on the basis of that information." Id. at 935-36 (emphases omitted). As a court may impose such a restriction over the objection of a party, see Fed. R. Civ. P. 26(c)(1), we have no trouble concluding that the same party may consent to the restriction in the first place.

Therefore, we reject David's argument that he has a right to see Román's report that is so fundamental as to be unwaivable.

**B**

David's second argument is that Román analyzed the wrong versions of BOSS and Independence. David contends that the only versions of BOSS and Independence registered with the Copyright Office are from 1999, and therefore

7

Román erred by analyzing the 2001 versions.

As we explained the last time these parties were before this court, "[i]f [a] theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it." Richison v. Ernest Grp., Inc., 634 F.3d 1123, 1127 (10th Cir. 2011); see also Singleton v. Wulff, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). "By contrast, if the theory simply wasn't raised before the district court, we usually hold it forfeited." Richison, 634 F.3d at 1128. "'Waiver is accomplished by intent, but forfeiture comes about through neglect.'" Id. (quoting United States v. Zubia–Torres, 550 F.3d 1202, 1205 (10th Cir. 2008)).

In the district court, David twice proposed that the special master analyze the 2001 versions of BOSS and Independence. He did so both in a red-line version of a proposed order appointing the special master, and in a clean version of the same proposed order. This led the district court to conclude that "[t]here [was] no dispute as to the first element" of a copyright infringement claim, namely whether "the plaintiff owns a valid copyright." Aplt. App. IV at 1257.

Recently, the Supreme Court held that the copyright registration requirement is nonjurisdictional. Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 166 (2010) ("Section 411(a) imposes a precondition to filing a claim that is not clearly labeled jurisdictional, is not located in a jurisdiction-granting provision,

and admits of congressionally authorized exceptions.  Section 411(a) thus imposes a type of precondition to suit that supports nonjurisdictional treatment under our precedents." (citation omitted)).  And, of course, "a party may waive or forfeit the benefit of a nonjurisdictional rule."  Muskrat v. Deer Creek Pub. Sch., 715 F.3d 775, 784 (10th Cir. 2013).

We conclude that David intentionally relinquished any argument concerning the copyright registration status of the 2001 versions of BOSS and Independence.  Therefore, we deem the argument waived in the district court and we decline to entertain it on appeal.

## C

David's third argument is that Román's report, which was adopted *in toto* by the district court, is flawed.  According to David, Román's report provides inadequate support for its conclusions, and, in any event, Cromwell is not substantially similar to BOSS or Independence.[1]

---

[1] David also argues that Román erred by applying an insurmountable standard for software copyright cases.  Specifically, David points us to Román's statement that "[w]ithout identified significant portions of copied code, the Defendants' Pmaster software program would not function to provide a payroll service that would meet the needs of diverse group of customers."  Aplt. App. III at 810.  This same line is echoed in the district court's order.  Id. IV at 1261 (noting parenthetically that "copying was essential to the functions of the program itself").  "[N]early every allegedly infringing piece of software would fail the Special Master's test," David says, because "[f]or most even reasonably efficient computer programs, removal of a single line of code could result in a failure of that program to function."  Aplt. Br. at 48-49.  Ernest Group replies that "the

(continued...)

9

We review a determination of substantial similarity *de novo*. Blehm v.

Jacobs, 702 F.3d 1193, 1199 (10th Cir. 2012).

**1**

We begin with the applicable law. "In order to establish copyright

infringement plaintiff must prove (1) that it owns a valid copyright, and (2) that

the defendant copied protectable elements of the copyrighted work." Mitel, 124

F.3d at 1370. "The second element requires us to consider two distinct issues."

Id. "First we must determine whether, as a factual matter, the defendant copied

plaintiff's work." Id. (footnote omitted); see also Julie E. Cohen et al., Copyright

in a Global Information Economy 291 (3d ed. 2010) (referring to "whether the

defendant copied from the plaintiff" as "copying in fact"). "Second, as a mixed

question of law and fact, we must evaluate whether the elements copied by the

defendant are protected by copyright." Mitel, 124 F.3d at 1370. In essence, this

second consideration asks whether defendant took "too much" of plaintiff's work;

---

[1](...continued)
Master's observation that the Cromwell software would not function as a payroll processing program without the copied source code was not the lynchpin of the Master's conclusion; it was merely one component of his analysis." Aplee. Br. at 30.

 We agree with Ernest Group. Román's conclusions do not appear to rest on the rationale that if the removal of a line of code would cause a program to fail, then that line of code is copyright-protected expression. Were that his view, the report would not have proceeded to address additional rationales. Still, we acknowledge that David is correct insofar as he asserts that this "would not function" idea is not the governing standard.

it asks what the level of "sameness" is between the two works.  See Cohen et al., supra, at 302-03.

A corollary of the "sameness" requirement is that "[c]opying deleted or so disguised as to be unrecognizable is not copying."  See v. Durang, 711 F.2d 141, 142 (9th Cir. 1983); see also Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 203 n.6 (1st Cir. 1996) ("Even if a work is copied, however, no copyright infringement exists if substantial changes render the work unrecognizable."); Warner Bros. Inc. v. Am. Broad. Cos., Inc., 720 F.2d 231, 241 (2d Cir. 1983) ("'[A] defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's.'" (quoting 3 Nimmer on Copyright § 13.03[B] at 13-38.1 to -38.2 (1983)).

Importantly, our concern for "sameness" is limited to those elements of plaintiff's work that constitute protectable expression.  See Country Kids 'N City Slicks, Inc. v. Sheen, 77 F.3d 1280, 1284 (10th Cir. 1996) ("[T]he question of whether Defendants infringed on Plaintiff's copyright turns on whether Defendants' product is substantially similar to the *protectable* elements of Plaintiff's product." (emphasis added)); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 833 (10th Cir. 1993) ("The court's inquiry does not end with a finding that the defendant copied portions of the plaintiff's program.  Liability for

11

copyright infringement will only attach where *protected elements* of a copyrighted

work are copied." (emphasis in original)); see also 17 U.S.C. § 102(b) ("In no

case does copyright protection for an original work of authorship extend to any

idea, procedure, process, system, method of operation, concept, principle, or

discovery, regardless of the form in which it is described, explained, illustrated,

or embodied in such work."); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d

693, 703 (2d Cir. 1992) ("It is a fundamental principle of copyright law that a

copyright does not protect an idea, but only the expression of the idea.").

As a result, we must ensure that we are comparing only those protectable

elements of plaintiff's work to defendant's work. To that end, "we find it useful

to apply the 'abstraction-filtration-comparison' test." Country Kids, 77 F.3d at

1284. As we explained in Country Kids,

> [a]t the abstraction step, we separate the ideas (and basic
> utilitarian functions), which are not protectable, from the
> particular expression of the work. Then, we filter out
> the nonprotectable components of the product from the
> original expression. Finally, we compare the remaining
> protected elements to the allegedly copied work to
> determine if the two works are substantially similar.

Id. at 1284-85; see Gates Rubber Co., 9 F.3d at 834 ("First, in order to provide a

framework for analysis, we conclude that a court should dissect the program

according to its varying levels of generality as provided in the abstractions test.

Second, poised with this framework, the court should examine each level of

abstraction in order to filter out those elements of the program which are

12

unprotectable. Filtration should eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination. Third, the court should then compare the remaining protectable elements with the allegedly infringing program to determine whether the defendants have misappropriated substantial elements of the plaintiff's program.").

**2**

With these settled principles in mind, we turn our focus to Román's report. In the report, Román should have documented his application of each step of the abstraction-filtration-comparison test. Because we conclude that he did not do so, we vacate the district court's order adopting the report and remand.

To begin, Román's report contains little evidence that he performed the abstraction step. In this first step, "we separate the ideas (and basic utilitarian functions), which are not protectable, from the particular expression of the work." Country Kids, 77 F.3d at 1285. The task of abstraction must be undertaken "conscientiously and systematically" in order to "'separate ideas from expression and eliminate from the substantial similarity analysis those portions of a work that are not eligible for copyright protection.'" Gates Rubber Co., 9 F.3d at 834 (quoting 3 Nimmer on Copyright § 13.03[F], at 13-102.17 (1983)). Although "[a]pplication of the abstractions test will necessarily vary from case-to-case and

13

program-to-program," a "computer program can often be parsed into at least six levels of generally declining abstraction: (i) the main purpose, (ii) the program structure or architecture, (iii) modules, (iv) algorithms and data structures, (v) source code, and (vi) object code." Id. at 834-35.

Taking this first level as an example, "[w]hen defining a program's main purpose, the court"—or in this case, the special master—"must take care to describe the program's function as specifically as possible without reference to the technical aspects of the program." Id. at 835. Román did not do this. Nor did he "conscientiously and systematically" document any other level of abstraction. See Gates Rubber Co., 9 F.3d at 834 (quoting 3 Nimmer on Copyright § 13.03[F], at 13-102.17 (1983)).

If anything, a fair reading of the report suggests that Román thought abstraction was superfluous. Paragraph 51 states that "[b]ecause of the extensive literal copying, it is not necessary [to] spend much time on abstracting the non-literal elements." Aplt. App. III at 821. In addition, in the "Principles and Guidance" portion of his report, Román cites to Mitel for the proposition that where "the alleged infringement constitutes the admitted literal copying of a discrete, easily-conceptualized portion of a work, we need not perform complete abstraction-filtration-comparison analysis." Id. at 809 (quoting Mitel, 124 F.3d at 1373).

A closer look at Mitel helps to clarify Román's apparent misstep. Mitel

14

concerned the copyrightability of four-digit computer "command" codes used to operate telecommunications equipment. 124 F.3d at 1368-69. Iqtel admitted to copying elements of Mitel's command codes in order to make Iqtel's equipment compatible with Mitel's. Id. Because Mitel contended that copyright protection extended only to the command codes—indeed, only to a discrete characteristic of the command codes—we determined that it was appropriate to "proceed directly to the protectability analysis that is normally subsumed in the filtration portion of the abstraction-filtration-comparison approach." Id. at 1373.

In contrast to Iqtel's position in Mitel, David has not "admitted literal copying of a discrete, easily-conceptualized portion of a work." See id. Ernest Group's allegation of copyright infringement is broad, and Román himself seems to think that evidence of infringement can be found across a wide spectrum of Cromwell's code. As a result, the expedited analysis sanctioned in Mitel has no place in Román's report. Abstraction is important, and it cannot be neglected here.

The next step is filtration. Gates Rubber Co., 9 F.3d at 834. But a deficient abstraction analysis necessarily undermines even the most careful attempt at filtration. This is because proper filtration involves "examin[ation of] each level of abstraction in order to filter out those elements of the program which are unprotectable." Id. Absent abstraction, therefore, filtration cannot proceed. Perhaps this gap in Román's analysis is why he could identify only a

15

single element of BOSS and Independence that he filtered out—menus. And when he did so, he could provide no more than one sentence of analysis: "At a high level of abstraction, menus are arguably unprotectable as a mode of operation, as being in the public domain, or being unoriginal." Aplt. App. III at 816-17. Simply put, we cannot conclude that Román performed abstraction and filtration "conscientiously and systematically." See Gates Rubber Co., 9 F.3d at 834 (quoting 3 Nimmer on Copyright § 13.03[F], at 13–102.17 (1983)). Indeed, not even Ernest Group contends that menus are the only unprotected element of the highly utilitarian software at issue in this case.

But Román's approach suffers from an even greater flaw. His report reads consonantly with the misconception that an infringement analysis begins and ends with "copying in fact." See Cohen et al., supra, at 291 (referring to "whether the defendant copied from the plaintiff" as "copying in fact"); see also Mitel, 124 F.3d at 1370 ("[W]e must determine whether, as a factual matter, the defendant copied plaintiff's work." (footnote omitted)). Román takes great pains to prove that portions of BOSS and Independence were "not written independently from scratch." Aplt. App. III at 822. At one point, he catalogues six techniques for "obscur[ing] similarities[, the use of which] can indicate purposeful concealment of copying," id. at 813-15, and then he lists for the reader example after example of the use of those techniques in Cromwell. Román even argues, at different points, that the absence in Cromwell of field comments or particular elements of

16

code creates the inference of copying followed by purposeful concealment.  In short, the question with which Román's report is concerned most is whether Cromwell was created from scratch.

But, of course, an infringement analysis does *not* begin and end with "copying in fact."  A finding of infringement also necessitates the conclusion that "the elements copied by the defendant are protected by copyright."  Mitel, 124 F.3d at 1370.  It is that conclusion that we assess using the abstraction-filtration-comparison test.  And, as we have explained, Román does not appear to have conducted that test.

Defending the report at oral argument, counsel for Ernest Group held up paragraph 52 as an example of Román's sound application of the abstraction-filtration-comparison test.  See Oral Arg. at 27:59-29:07.  In point of fact, we agree with counsel that paragraph 52 constitutes Román's best analysis.  Here is the complete paragraph:

> 52. Exhibit 3-2 shows the STATETAXDATES.SETDATES procedure on the left and the corresponding STATEDEPOSITDATES.DETERMINEDATES on the right. The code on the left, starting at line 2363, has program instructions that select 26 cases that were identified by the Plaintiffs as "A" through "Z."  The assignments of the letters A-Z was not driven by external factors and could have been assigned in a different order.  Note that the Defendants' PMaster source on the left does not implement all 26 cases, but instead only implements A-H, Q, R, S, W, X, and Y.  The corresponding assignments of A-E, G-H, R, and X are identical the original cases.  Further, the comments, although split on

17

separate lines, are identical (e.g. lines 2363 vs. 655; 2409 vs. 703) or almost identical (e.g. lines 2365 v. 659; 2367 v. 663; 2369 v. 667; 2371 v. 671; 2375 v. 679; 2377 v. 683; 2397 v. 691) to the original comments. This combination of information strongly supports a finding that the source code was copied and obscured, and was not written independently from scratch.

Aplt. App. III at 821-22.

Even in paragraph 52, though, Román falls short. His report fails to explain the function of the code in Exhibit 3-2, leaving us unable to meaningfully review Román's apparent conclusion that the ordering of these dates falls on the "expression" side of the "idea/expression" and "process/expression" distinctions. See Blehm, 702 F.3d at 1201; Gates Rubber Co., 9 F.3d at 836-37. Nor can we say whether Exhibit 3-2 was "subject to the rigors of filtration analysis which excludes from protection expression that is in the public domain, otherwise unoriginal, or subject to the doctrines of merger and scenes a faire." Mitel, 124 F.3d at 1372. Simply incanting that the dates "could have been assigned in a different order," Aplt. App. III at 822, is not analysis; it is mere conclusion. Perhaps worse, Román seems to believe that the paragraph serves primarily to support his determination that the code was "copied and obscured, and was not written independently from scratch." Id. This is yet more evidence that Román proceeded from the false premise that an infringement analysis begins and ends with "copying in fact."

Finally, we think it bears repeating that, in the district court, *Ernest Group*

18

asked the court to "resubmit this matter to the Master" because "the Master could and/or should do more to explain, document, and establish the basis and support for his opinion." Id. II at 675, 678. As it turns out, we agree.

In fairness, it could be the case that Román applied the complete abstraction-filtration-comparison test during his work prior to drafting his report. Perhaps Román did an exemplary job, and perhaps his conclusions are unassailable. But with only the meager support included in his report, we cannot know for sure. Therefore, we vacate the district court's order and remand.

**IV**

On remand, David asks that a different special master be appointed. In David's view, Román was "tainted" with bias when Román received David's attorneys' critical evaluation of his report, and, furthermore, Román's work is so inadequate as to prove that he is unqualified to serve as special master in this case. David cites to no authority for either proposition.

Under 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Federal Rule of Civil Procedure 53(a)(2) applies § 455 to special masters. See Fed. R. Civ. P. 53(a)(2) ("A master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any

19

potential grounds for disqualification."); <u>Guardian Pipeline, L.L.C. v. 950.80 Acres of Land</u>, 525 F.3d 554, 556 (7th Cir. 2008) ("[C]ircuits have disagreed about the application of § 455 to special masters and land commissioners. To resolve this conflict the Supreme Court amended Fed.R.Civ.P. 53(a)(2) in 2003 to subject special masters to the requirements of § 455." (citations omitted)).

We disagree with David's contention that Román has been tainted with bias. Just as a district court judge should not be disqualified on the ground that one party disagreed with the judge's decision, so should Román not be disqualified on the ground that one party disagreed with his report. We also reject David's assertion that Román is unqualified to continue as special master. Román was appointed "[u]pon agreement of the parties," Aplt. App. II at 632, and we discern no basis for concluding that Román is unqualified to supplement his work on remand. In fact, at the end of his report, Román offered to do additional analysis if needed. <u>Id.</u> III at 828.

Therefore, we reject David's assertion that Román is biased and unqualified. We also decline David's invitation to require the appointment of a different special master on remand. Whether it becomes necessary to appoint a different special master on remand for *other* reasons remains to be seen, and we intend no absolute prohibition in that regard. We address here only the allegations raised by David in seeking Román's removal.

20

## V

We VACATE the district court's order adopting Román's report, and REMAND with instructions for the district court to request a more thorough report with which to analyze Ernest Group's copyright infringement claim. The briefs and appendix filed in this case are to remain under seal.