# IN THE SUPREME COURT OF IOWA

No. 13–1525

Filed June 26, 2015

**SIOUX PHARM, INC.** and **SIOUX BIOCHEMICAL, INC.,**

Appellants,

vs.

**EAGLE LABORATORIES, INC.; BIO-KINETICS CORPORATION;** and **DANA SUMMERS,**

Appellees.

---

Appeal from the Iowa District Court for Sioux County, Duane E. Hoffmeyer, Judge.

Plaintiff appeals interlocutory ruling compelling disclosure of trade secrets to competitor. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Anthony L. Osborn and Jeana L. Goosmann of Goosmann Law Firm, PLC, Sioux City, for appellants.

Matthew J. Connealy and Daniel L. Hartnett of Crary, Huff, Ringgenberg, Hartnett & Storm, P.C., Sioux City, for appellees.

**WATERMAN, Justice.**

In this case involving claims for misappropriation of trade secrets, we have before us an interlocutory appeal on a discovery issue. In particular, the plaintiffs ask us to review a district court order requiring the redesignation of the plaintiffs' standard operating procedures (SOPs) from "attorneys' eyes only" to "confidential." The underlying protective order allowed each party to designate highly sensitive proprietary or trade-secret information whose disclosure to another party in the case would cause severe competitive damage as "attorneys' eyes only." Under this designation, only court personnel, attorneys, and outside experts could review the material. The district court removed the "attorneys' eyes only" designation for any of plaintiffs' SOPs alleged to have been misappropriated, converted, or used without authorization by the defendants. With the modification, these materials would remain confidential and not disclosed to the public, but would be disclosed to the defendants themselves.

Plaintiffs urge that the district court abused its discretion in issuing the order. On appeal, we agree that the court abused its discretion. The defendants did not argue below that the plaintiffs improperly designated materials under the order and did not provide any basis for modifying the order other than conclusory assertions and a statement that they, unlike the plaintiffs, had elected not to hire an expert in order to save money. On this record, these grounds are not enough. We conclude that while the district court may have had other valid grounds for ordering redesignation, this is not apparent from the terms of the order, and therefore, we must reverse and remand. In short, removing the "attorneys' eyes only" designation may be appropriate, but the court's rationale for doing so is insufficient. Accordingly, we reverse

the district court's ruling and remand for further consideration in light of a number of factors discussed in this opinion, including (1) the standards set forth in the stipulated protected order for designation of material as "attorneys' eyes only"; (2) the need for defendants, in addition to their attorneys and experts, to have access to the materials to properly defend the plaintiffs' claims; and (3) the potential harm to the plaintiffs that would result from disclosure of the materials to the defendants.

## I. Background Facts and Proceedings.

This litigation involves a battle between the two domestic producers of chondroitin sulfate, Sioux Pharm, Inc. and Eagle Laboratories, Inc., and other individuals and entities named in the litigation, hereinafter referred to collectively as Sioux Pharm and Eagle Labs, respectively.

Chondroitin sulfate is a component of dietary supplements for joint health. Sioux Pharm, located in Sioux Center, makes the product from bovine trachea and other ingredients. Its manufacturing processes utilize chemical and biological research, unique procedures, specialized tools, machinery, hardware, and software. Sioux Pharm restricts access to its manufacturing facilities and requires its employees to sign confidentiality agreements. Sioux Pharm's expert testified Sioux Pharm's processes differ substantially from the processes known in the public domain, its proprietary methods are worth approximately $4.4 million, and its processes have changed significantly since 2003 when two individuals at the center of this dispute resigned.

Robert Den Hoed and Dana Summers are former employees of Sioux Pharm. Den Hoed left his job with Sioux Pharm in 2001 and launched Eagle Labs in 2003. Den Hoed is the president, CEO, and majority owner of Eagle Labs. Summers left his position with

Sioux Pharm in 2003 and became the secretary for Eagle Labs. Eagle Labs began producing chondroitin sulfate in 2005 and is Sioux Pharm's only domestic competitor.

Eagle Labs is a small business with no more than four employees, including Den Hoed and Summers, operating out of a small building behind Den Hoed's family home. By contrast, Sioux Pharm occupies a 40,000-square-foot facility and estimates that its operation is ten times larger than Eagle Labs'.

On March 1, 2012, Summers contacted Sioux Pharm and asked to visit the plant, but his request was refused. Two nights later, Sioux Center police received a call reporting a suspicious red truck parked by the Sioux Pharm facilities. Officers investigating the call found the truck outside and an exterior door propped open with a wrench. The officers caught Summers breaking into Sioux Pharm. Summers had a set of six keys to Sioux Pharm in his pocket, including a master key, and the officers found another master key in the parking lot near Summers's truck. The officers searched Summers's truck and found a white binder that turned out to be an SOP manual. After changing his story several times, Summers admitted that he had stolen the manual that night. He was charged with burglary in the third degree in violation of Iowa Code sections 713.1 and 713.6A (2011). Sioux Pharm alleges that the break-in was an act of deliberate corporate espionage, while Eagle Labs claims that Summers acted on his own, without its knowledge or authorization.[1]

---

[1]Evidence regarding the break-in, including a police report and the judgment entry in Summers's criminal case, was submitted in the course of the subsequent litigation between Sioux Pharm and Eagle Labs and relied upon by the district court in various pretrial rulings. As the district court found,

On March 8, Sioux Pharm filed this civil action claiming trade-secrets violations against Eagle Labs, Bio-Kinetics Corporation, Summers, Den Hoed, and John Ymker, a partner in Eagle Labs. Sioux Pharm's petition alleged that Eagle Labs misappropriated trade secrets, intentionally interfered with contracts and prospective business advantage, and engaged in civil conspiracy. In later amendments to the petition, Sioux Pharm added claims of unfair competition.

With respect to its trade-secret claims, Sioux Farm broadly alleged in Count I that it

> utilize[s] trade secrets in the form of secret chemical and biological research, secret systems, secret procedures, secret software programs, secret specialized hardware, and secret specialized tools, machinery and production processes, all of which allow Plaintiffs to produce a variety of unique, highly specialized products . . . with efficiency and precision.

Sioux Pharm further alleged that the above trade secrets were the result of significant efforts and expenditures by the plaintiffs, they provide substantial advantages over competitors, and plaintiffs own the trade secrets. According to the petition, Sioux Pharm undertook "very deliberate steps" to ensure that outsiders such as the defendants had no access to Sioux Pharm facilities and SOPs, including limiting access to the facilities and requiring plaintiffs' employees to sign confidentiality agreements. The petition alleged that the defendants obtained the trade secrets through physical intrusion into the plant and through theft/review of Sioux Pharm's SOP manual and trade secrets.

Upon the filing of the petition, Sioux Pharm obtained an ex parte order from the district court authorizing Sioux Pharm to seize the

---

Defendant Summers is an officer and employee of the defendant Eagle Laboratories and was . . . caught [burglarizing] the plaintiff's place of business and had a notebook of the plaintiffs' SOPs in his pickup truck.

computer and telephone equipment of Eagle Labs and to engage in a walk-through of the Eagle Labs facility. Pursuant to the court order, Sioux Pharm seized the equipment, engaged in the "walk through," and took various photographs on March 13, 2012. In its answer, Eagle Labs specifically denied all of Sioux Pharm's allegations relating to trade secrets.

The parties also filed discovery motions. First, Eagle Labs sought a protective order on March 15 to protect any trade-secret information acquired during the walk-through. The district court ruled that all such information could only be reviewed by attorneys for the parties working together. Sioux Pharm, in turn, filed a motion on June 4 seeking greater access to the material, but agreeing that a protective order was necessary to protect the trade secrets of each party. The parties subsequently agreed to, and the district court entered, a stipulated protective order on August 6.

The stipulated protective order allows each party to designate materials as "confidential" or "attorneys' eyes only" (AEO):

> The designation of 'CONFIDENTIAL' by the Producing Party constitutes the representation that it reasonably and in good faith believes the Discovery Material constitutes or discloses confidential, non-public, and/or protective information under Iowa law. The designation of 'ATTORNEYS' EYES ONLY' by the Producing Party constitutes the representation that it reasonably and in good faith believes the designated material constitutes or discloses confidential, non-public, and/or proprietary information containing highly sensitive proprietary, financial, or trade secret information, which would cause severe competitive damage if disclosed to another party to this action.

Under the terms of the order, confidential information may be disclosed only to attorneys, court personnel, parties, experts, and witnesses—with the latter three groups required to execute a prior agreement to be bound

by the terms of the order. AEO material—unlike confidential material—may not be disclosed to the parties themselves. The order also restricts use of confidential and AEO "to the purposes of this litigation and . . . not . . . any other purpose."

The stipulated protective order defines AEO information as follows:

> "Attorneys' Eyes Only" information means confidential, non-public, and/or proprietary information containing highly sensitive proprietary, financial, or trade secret information, which would cause severe competitive damage if disclosed to another party to this action, provided in any form whatsoever in this action . . . .

Additionally, the stipulated protective order allows any party to challenge an AEO or confidential designation and seek redesignation. The party must first ask the producing party in writing to redesignate. If that request is not granted within five days, the requesting party may seek redesignation from the court. The order states, "In connection with any such motion, the burden shall be [on] the Producing Party to defend the appropriateness of the designation as Confidential or Attorney's Eyes Only. Any such objections to such designations shall be made in good faith." The order further provides:

> If the Court upon motion finds that the challenged document or deposition testimony is improperly designated and the Producing Party was not acting in good faith in refusing consent to disclosure, voluntary withdrawal of designation or voluntary re-designation, the Court may grant relief as appropriate under Iowa Rule of Civil Procedure 1.517.

The stipulated protective order also contains a general provision allowing amendments:

> This Protective Order may be amended with respect to specific Discovery Materials without leave of Court by the agreement of counsel for the Producing Party and Receiving Party in the form of a Stipulation filed in this case. This Protective Order shall remain in full force and effect

> indefinitely until modified, superseded or terminated on the record by written agreement of the Parties or by order of this Court. This Court shall retain jurisdiction during the pendency of this action and thereafter to enforce this Protective Order and to grant relief for any violation thereof.
>
> Nothing contained in this Protective Order shall be construed to affect or govern the scope of discovery in this action, or to preclude any Party from moving this Court for further order or relief.

The district court entered a scheduling order that required Sioux Pharm to designate experts no later than 210 days before trial or by March 15, 2013, and Eagle Labs to designate experts no later than 150 days before trial or by May 17, 2013. Trial was scheduled for October 15, 2013.

Sioux Pharm's petition initially alleged that Eagle Labs misappropriated trade secrets solely in the break-in of March 3, 2012. Eagle Labs chose not to designate any experts, concluding that Den Hoed and Summers could adequately explain the origin of their SOPs and no experts were necessary to defend the allegations based on the break-in. Both parties produced their SOPs under the AEO designation, and Sioux Pharm heavily redacted portions of its SOPs.[2] In a second amended petition filed April 23, 2013, Sioux Pharm added claims against Summit Nutritionals International, Inc. and Federal Laboratories Corporation for unfair competition and related claims.

On May 10, 2013, Eagle Labs moved for leave to file counterclaims against Sioux Pharm. Eagle Labs asserted that Sioux Pharm trespassed on its property when its representatives entered the property of Eagle Labs pursuant to an ex parte temporary restraining order issued in the case. According to Eagle Labs, while the court authorized a "short walk-through," the Sioux Pharm representatives, including its principal

---

[2]Eagle Labs also made redactions to its SOPs.

officers, trespassed on the property by engaging in an examination of property and facilities that far exceeded the scope of the district court's order. Eagle Labs also claimed that if trade secrets were in fact involved in the process of the manufacture of chondroitin sulfate, as Sioux Pharm alleged, then Sioux Pharm misappropriated Eagle Labs' trade secrets through its inspection of Eagle Labs' facilities that exceeded the scope of the district court's order.

On June 7, the district court ordered two separate trials—one for Sioux Pharm's trade-secrets claim and one for its unfair competition claim. The unfair competition component of the case is not at issue in this appeal.[3] The court also denied Eagle Labs' motion for leave to file a counterclaim. Subsequently, the district court denied Sioux Pharm's August 7 motion to file another amended complaint, adding allegations that Eagle Labs had copied Sioux Pharm's SOPs before the March 3, 2012 break-in. On October 4, the district court granted summary judgment dismissing trade-secret claims against Den Hoed and Ymker individually.

Although both sides produced SOPs under the AEO designation, Eagle Labs contests the trade-secret status of Sioux Pharm's SOPs. In particular, Eagle Labs contends at least some of Sioux Pharm's SOPs lack trade-secret status based on disclosures made and positions taken by plaintiff Sioux Biochemical, Inc. in prior litigation against Cargill, Inc.[4]

---

[3]In a separate appeal, we affirmed the district court's ruling that Summit is subject to personal jurisdiction in Iowa. *Sioux Pharm v. Summit Int'l*, 859 N.W.2d 182, 197 (Iowa 2015).

[4]Approximately, a decade before, plaintiff Sioux Biochemical, Inc. had sued Cargill for misappropriation of trade secrets. *See Sioux Biochem., Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785 (N.D. Iowa 2005). In the lawsuit, Sioux Pharm's president and co-owner, Dr. Allen Kramer, attested that Cargill had converted and disclosed "step-by-step details" of his company's manufacturing method. Sioux Pharm responds that its SOPs evolved after that and were not the same in 2012 as the SOPs in the earlier Cargill

Sioux Pharm, through affidavit, asserts the SOPs at issue in this case remain protected trade secrets. The district court, after it entered the stipulated protective order, has made no findings that the specific SOPs sought by Eagle Labs either contain trade secrets or do not.

On September 3, Eagle Labs filed a motion to have Sioux Pharm's SOPs redesignated from AEO to confidential. In its motion, Eagle Labs said it would be "impossible for Defendants to adequately prepare their case for trial unless the above-referenced information [i.e., the SOPs] is redesignated from AEO to 'confidential.'" Eagle Labs added that redesignation "would permit Defendants' counsel the opportunity to share this information with their clients so that evidence can be developed to address the allegations being made by Plaintiffs." In the same motion, Eagle Labs also offered to redesignate *its own SOPs* (which it had previously designated AEO) from AEO to confidential. Eagle Labs did not submit any affidavit or other evidence in support of its motion.

Sioux Pharm filed a resistance to Eagle Labs' motion for redesignation. Sioux Pharm's resistance also was not supported by any affidavit or other evidence specific to the motion. The resistance made the point that Eagle Labs was not contesting the AEO designation under the protective order. According to Sioux Pharm, since the materials had been properly designated, and the defendants had stolen from Sioux Pharm, the protective order should not be modified to drop the AEO designation. Eagle Labs also filed a motion to compel Sioux Pharm to produce unredacted SOPs.

Following hearings, the district court granted both motions by an order entered September 23. The order required Sioux Pharm to identify

litigation. The district court denied Eagle Labs' request that it grant summary judgment on the ground that the asserted trade secrets were in the public domain.

which specific SOPs have been misappropriated and produce unredacted copies of those SOPs designated "confidential" rather than AEO. The court's order stated:

> The court has determined the plaintiff must identify which specific SOPs have been misappropriated, converted or used without authorization. These must be disclosed by October 1, 2013 after a series of discovery disputes. The court finds these identified SOP classifications should be changed to that of "confidential" for purposes of this case only.
>
> The court in conducting its balancing of the various priorities, finds that this action is necessary to do justice and to allow the defendants to appropriately understand and prepare their trial defense strategy.

Sioux Pharm filed an application for interlocutory appeal and request for immediate stay as well as a motion for reconsideration on September 27. On September 30, the district court denied Sioux Pharm's motions for a stay and for reconsideration, pointing out that Sioux Pharm "made several recent efforts to clarify and (in the court's opinion) efforts to expand the scope of discovery beyond the pleadings that would add issues and result in trial being continued." The district court ordered Sioux Pharm to produce unredacted copies of every SOP it claimed Eagle Labs misappropriated, without the AEO designation. This would allow Den Hoad and Summers to review them. The district court explained:

> Conceivably, if Plaintiffs are making their disclosure in good faith, there would be few, if any, surprises because Plaintiffs have had the opportunity to see and compare the SOPs of both parties prior to its disclosure. This eliminates a generic allegation of theft or misappropriation and helps the court in defining what is admissible evidence at trial . . . not a scattergun approach that may lead to efforts to admit inadmissible or irrelevant evidence that would result in any jury verdict being set aside.
>
> This disclosure then allows the defendants to view and ultimately understand what it is that they have allegedly

misappropriated, converted or used without authorization. This method allows them to assist their attorneys in their defense. Absent disclosures, the defendants do not know which SOP the plaintiffs will present evidence on as misappropriated, converted or used without authorization and essentially would result in "trial by ambush."

On October 31, we granted Sioux Pharm's application for interlocutory appeal, which placed its disclosure obligations on hold. We retained the appeal.

**II. Standard of Review.**

As a general proposition, we review a district court's discovery ruling for abuse of discretion. *Mediacom Iowa L.L.C. v. Inc. City of Spencer*, 682 N.W.2d 62, 66 (Iowa 2004). A district court abuses its discretion "when the grounds underlying a district court order are clearly untenable or unreasonable." *Id.* " ' "A ground or reason is untenable . . . when it is based on an erroneous application of the law." ' " *Office of Citizens' Aide/Ombudsman v. Edwards*, 825 N.W.2d 8, 14 (Iowa 2012) (quoting *In re Gianforte*, 773 N.W.2d 540, 544 (Iowa 2009)).

In the context of trade-secret litigation, from the beginning, the cases have stressed the role of the district court judge in balancing the interests of the parties when determining the circumstances of disclosure. Justice Oliver Wendell Holmes in one of the leading early trade-secret cases emphasized that "it will rest in the judge's discretion to determine whether, to whom, and under what precautions, the revelation should be made." *E.I. du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100, 103, 37 S. Ct. 575, 576, 61 L. Ed. 1016, 1019 (1917); *see also Centurion Indus., Inc. v. Warren Steurer & Assocs.*, 665 F.2d 323, 326 (10th Cir. 1981). More recently, it has been said that the nature of disclosure in a trade-secret case " 'is singularly within the discretion of the district court,' " *Dove v. Atl. Capital Corp.*, 963 F.2d 15,

19 (2d Cir. 1992) (quoting *Galella v. Onassis*, 487 F.2d 986, 997 (2d Cir. 1973)), and that "[t]he unique character of the discovery process requires that the trial court have substantial latitude to fashion protective orders," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S. Ct. 2199, 2209, 81 L. Ed. 2d 17, 29 (1984). According to authorities, the balancing of competing rights of the parties poses "a very difficult decision," *see* Peter F. Daniel, *Protecting Trade Secrets from Discovery*, 30 Tort & Ins. L.J. 1033, 1042 (1995), that requires "liberal discretion" in the hands of the trial judge, *see* Robert A. Matthews Jr., 6 *Annotated Patent Digest* § 41:120, at 41-258 (2008).

### III. Analysis.

**A. Production of Unredacted SOPs.** We begin by addressing a preliminary matter. The order that Sioux Pharm has appealed requires Sioux Pharm to produce unredacted SOPs. Sioux Pharm has appealed this issue, but just barely. Its total briefing on this issue consists of the following paragraph:

> Believing it had no other option, and in a desperate attempt to avoid the full disclosure of its SOPs to Defendants, Sioux Pharm reluctantly offered during oral argument to produce unredacted SOPs (which could not be viewed by Defendants themselves, because they would remain AEO). However, Sioux Pharm only offered to do so if absolutely necessary to avoid producing redesignated "Confidential" SOPs (which Defendants could view). To be clear, Sioux Pharm does not want to be forced to unredact its SOPs, either, even if such redactions might hinder Sioux Pharm's prosecution of this lawsuit.

To the extent this is an argument against producing unredacted SOPs, we are not persuaded. Sioux Pharm must produce complete, unabridged versions of the SOPs to allow the defendants to defend the case fairly. Because Sioux Pharm contends its case turns at least in part on similarities between each party's SOPs in content, font, margins, and

formatting, counsel for Eagle Labs cannot fairly prepare a defense without seeing the SOPs allegedly misappropriated. When claims hinge on a close textual comparison of each side's SOPs containing detailed technical information and alleged trade secrets, there is simply no alternative to the production of unredacted SOPs. Although both sides apparently made redactions, the stipulated protective order makes no provision for redaction of documents produced with the AEO designation. Redactions under these circumstances violate the basic principle that "our discovery rules are to be liberally construed to effectuate the disclosure of relevant information." *Farnum v. G.D. Searle & Co.*, 339 N.W.2d 384, 389 (Iowa 1983).

We now turn to the fighting issue on appeal: whether the district court abused its discretion in ordering the SOPs (which would be unredacted) reclassified from AEO to confidential.

**B. AEO Designations in Protective Orders—Some Relevant Principles.** "[T]here is no true privilege against discovery of trade secrets or other confidential information." *Mediacom Iowa*, 682 N.W.2d at 66. Yet, once a trade secret is disclosed to a competitor and litigation adversary, it may be too late to grant an adequate remedy to the holder of the secret—the disclosure destroys the value of the secret data. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011, 104 S. Ct. 2862, 2877, 81 L. Ed. 2d 815, 838 (1984) ("Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data."); *Air Prods. & Chems., Inc. v. Johnson*, 442 A.2d 1114, 1129 (Pa. Super. Ct. 1982) (noting that disclosure of trade secrets in open court would "defeat the entire purpose of the action"). The Iowa legislature in

the Uniform Trade Secrets Act has directed courts to preserve trade secrets in litigation by reasonable means:

> In an action brought under this chapter, a court shall preserve the secrecy of an alleged trade secret by reasonable means, including but not limited to granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering a person involved in the litigation not to disclose an alleged trade secret without prior court approval.

Iowa Code § 550.7.  Nevertheless, "a trade secret must and should be disclosed if the disclosure is relevant and necessary to the proper presentation of a plaintiff's or defendant's case."  *Mediacom Iowa*, 682 N.W.2d at 66.

Once a district court has found information sought in discovery is a trade secret, it must determine whether good cause exists for a protective order.  *Id.* at 67.  The court should employ three criteria:

> " '[T]he harm posed by dissemination must be substantial and serious; the restraining order must be narrowly drawn and precise; and there must be no alternative means of protecting the public interest which intrudes less directly on expression.' "

*Id.* at 68 (quoting *Farnum*, 339 N.W.2d at 389–90).  The district court is to "strike a balance between the policy favoring discovery and free expression on one side and a party's interest in avoiding commercial damage and preventing an abuse of discovery on the other."  *Farnum*, 339 N.W.2d at 390.  After the court has weighed the harm from disclosure against the need for the information, the court "must issue an appropriate protective order to safeguard the rights of the parties."  *Highway Equip. Co. v. Cives Corp.*, No. C04–0147, 2007 WL 1612225, at *3 (N.D. Iowa 2007).  A court has broad discretion to craft the terms of the protective order under rule 1.504.  Iowa R. Civ. P. 1.504(1)(*a*)(7) ("[The court] [m]ay make any order which justice requires to protect a

party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . [t]hat a trade secret . . . not be disclosed or be disclosed only in a designated way.").

Litigation over protective orders arises in various contexts. Sometimes the issue is whether a protective order should be modified so that third parties may gain access to the material. In *Comes v. Microsoft Corp*, we considered a request by plaintiffs in a Canadian antitrust litigation against Microsoft to gain access to confidential materials from the Iowa litigation. *See Comes v. Microsoft Corp.*, 775 N.W.2d 302, 304–05 (Iowa 2009). After reviewing caselaw from federal appellate courts and elsewhere regarding modification of protective orders to allow third-party access to litigation discovery designated as confidential, we said:

> After considering the various approaches other courts have taken to address requests to modify protective orders, we conclude the soundest approach is to balance the interests at stake, taking into account the reasons for the issuance of the protective order in the first place and whether the legitimate interests of the parties can still be protected with the suggested modification. The court should also consider to what extent the party opposing modification has reasonably relied on the terms of the protective order and whether the party would have relied on the protective order had the suggested modification initially been included in it. In a case such as this one, the court should consider the value of the interests of the party seeking modification, as well as any public interest in judicial economy and public disclosure, if appropriate. The court should consider whether the party seeking modification is attempting to circumvent discovery or evidentiary restrictions in some other jurisdiction. Because each situation in which a party or third party seeks modification will be different, we will not try to list all the considerations the district court may take into account when making its decision, but the court should fully and fairly consider all the circumstances supporting the modification, as well as the circumstances mitigating against it, and not employ any presumption for or against modification.

*Id.* at 309–10. We concluded by expressly disavowing any presumption against the modification of protective orders. *Id.* at 310.

Although the principles of *Comes* apply here, this case involves a different issue than the *Comes* case. Here, the question is whether materials that have been designated AEO under a stipulated protective order that permits this redesignation should be reclassified as confidential. We recognize that in trade-secret litigation, "courts often issue protective orders limiting access to the most sensitive information to counsel and their experts." *Tailored Lighting, Inc. v. Osram Sylvania Prods., Inc.*, 236 F.R.D. 146, 148 (W.D.N.Y. 2006); *see also Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988) (collecting cases). The United States Court of Appeals for the Tenth Circuit recently stated:

> "The disclosure of confidential information on an 'attorneys' eyes only' basis is a routine feature of civil litigation involving trade secrets. The purpose of this form of limited disclosure is to prevent a party from viewing the sensitive information while nevertheless allowing the party's lawyers to litigate on the basis of that information."

*Paycom Payroll, LLC v. Richison,* 758 F.3d 1198, 1202–03 (10th Cir. 2014) (quoting *In re City of New York,* 607 F.3d 923, 935–36 (2d Cir. 2010) (emphasis omitted) (citing Fed. R. Civ. P. 26(c)(1)(G))).

The main concern of parties seeking to impose AEO restrictions is fear that dissemination of sensitive information, particularly to decision-makers of its competitors, would threaten serious competitive harm. Even when the decision-makers of the opposing party act in complete good faith, courts assert that they will simply not be able to compartmentalize what they learn. *See BASF Corp. v. United States*, 321 F. Supp. 2d 1373, 1380 (Ct. Int'l Trade 2004); *see also F.T.C. v. Exxon Corp.,* 636 F.2d 1336, 1350 (D.C. Cir. 1980) ("[I]t is very difficult for the

human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so."); *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 299 F.R.D. 498, 501 (W.D. Va. 2014) (noting that proposed protective order allowing "technical advisors" to examine documents was insufficient because "they would be required to separate their own thoughts and ideas from their competitors' thoughts and ideas in all future endeavors," which would be difficult, if not impossible).  As a result, even though it may be completely innocent, competitive decision-makers could subconsciously use sensitive information against the disclosing party's interest.  *See, e.g.*, *McAirlaids*, 299 F.R.D. at 501 (holding that "proposed protective order creates an unacceptable risk of inadvertent disclosure").  The caselaw uniformly and sensibly holds, all other things being equal, that the risk of harm from disclosure to a competitor is generally greater than the risk of harm related to disclosure to a noncompetitor.  *See Am. Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 741 (Fed. Cir. 1987) (noting "[c]ourts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor"); *see, e.g.*, *BASF*, 321 F. Supp. 2d at 1381; *Medtronic Sofamor Danek, Inc. v. Michelson*, No. 01–2373–GV, 2002 WL 33003691, at *3–4 (W.D. Tenn. Jan. 30, 2002).

On the other hand, the opposing party seeking disclosure, even if a competitor, may claim that disclosure of documents to its decision-makers is necessary to allow it to litigate effectively.  For example, in *In re Wilson,* 149 F.3d 249, 252–53 (4th Cir. 1998), the Fourth Circuit upheld a bankruptcy court decision to allow at least some disclosure of protected trade secrets to high-level employees of the corporation's competitor, reasoning that though the plaintiff may suffer inevitable harm from disclosure, the defendant's need to understand the

claim charged against him outweighed the potential harm of disclosing trade secrets to the competitor. In some contexts, the opposing party may assert, for instance, that its decision-makers have unusual expertise in the subject matter of the litigation that might not be available to outside experts. *See 2 Hounds Design Inc. v. Brezinski*, No. 3:13–CV–101–RJC–DCK, 2013 WL 5938073, at *3–4 (W.D.N.C. Nov. 5, 2013); *Frees, Inc. v. McMillian*, No. 05–1979, 2007 WL 184889, at *5 (W.D. La. Jan. 22, 2007); *MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 499 (D. Kan. 2007); *Medtronic*, 2002 WL 33003691, at *3–4; *THK Am., Inc. v. Nippon Seiko K.K.*, 141 F.R.D. 461, 462 (N.D. Ill. 1991); *Bee Chem. Co. v. Serv. Coatings, Inc.*, 253 N.E.2d 512, 516–17 (Ill. App. Ct. 1969). A naked contention, however, that access will affect the ability of the defendant to defend its case, without more, is not sufficient. *See McAirlaids*, 299 F.R.D. at 500–02 (court refused to modify existing protective order based on party's assertion that it needed its decision-makers to have access to documents to make an "educated business decision with regard to the litigation"). In order to evaluate the asserted need for further disclosure, the court must have a thorough understanding of the contested issues in the case, how the documents relate to the contested issues, and how the fact-finding process would be aided by disclosure of the documents to the persons seeking to view the documents.

There appears to be a prevailing view among courts addressing the issue that competitive decision-makers of direct competitors should be denied access to trade secrets in litigation. *See Paycom Payroll, LLC*, 758 F.3d at 1202–03 (noting AEO restriction is a "routine feature"); *In re City of New York*, 607 F.3d at 935 (same); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470–71 (9th Cir. 1992) (denying in-house counsel

access to trade secrets because they were involved in decision-making); *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984) ("In a particular case, *e.g.,* where in-house counsel are involved in competitive decisionmaking, it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed."); *Northbrook Digital, LLC v. Vendio Servs., Inc.*, 625 F. Supp. 2d 728, 735–36 (D. Minn. 2008) (observing that protective orders may be directed at a party's outside patent-prosecution lawyers); *Highway Equip. Co.*, 2007 WL 1612225, at *4 (ruling that in-house counsel could not view designated materials); *Safe Flight*, 682 F. Supp. at 22 (collecting cases in which trade secrets were revealed only to opposing party's trial attorneys and independent experts).

In *Safe Flight*, plaintiff's president, Leonard Greene, asked to act as his own expert because of his position as a "preeminent aeronautic engineer, having received more than sixty aeronautic patents." 682 F. Supp. at 21. Greene argued that he was uniquely qualified and that without his review his attorneys would be unable to make the right decisions. *Id.* The court disagreed, noting that Greene would inevitably retain some of what he learned from the disclosures that would guide his future research, and he had not investigated using outside experts. *Id.* at 22. In a similar case, the plaintiff's president and inventor of the patent at issue, sought access to "highly confidential" material designated for attorneys' eyes only so he could testify as an expert. *Tailored Lighting*, 236 F.R.D. at 147. The court found the "substantial risk of competitive injury that attends disclosure of such trade secret information to the opposing party's president" outweighed the plaintiff's inconvenience and expense in hiring outside expert. *Id.* at 149.

The court in *Safe Flight,* however, did allow defendant to use in-house counsel to review confidential materials because those attorneys were "segregated" from competitive decision-making. 682 F. Supp. at 23. The court noted that lawyers are officers of the court and bound by obligations of professional responsibility preventing any misuse of the confidential information. *Id.* We, too, have recognized that "[a]lthough a strong tradition of loyalty exists between a lawyer and client, a lawyer is also an officer of the court who is bound by a code of professional conduct." *Wemark v. State,* 602 N.W.2d 810, 816 (Iowa 1999); *see also State v. Walker*, 804 N.W.2d 284, 294 (Iowa 2011) (quoting *Wemark* to uphold right of an inmate to private conference with attorney notwithstanding jail rules restricting access to prevent smuggling of contraband). Even when courts explicitly credit a party or in-house counsel with integrity and good faith, they recognize that human nature makes misuse of trade secrets by a competitor too tempting to risk. *See Brown Bag*, 960 F.2d at 1471 ("The magistrate had to consider, however, not only whether the documents could be locked up . . . , but also whether Brown Bag's counsel could lock-up trade secrets in his mind, safe from inadvertent disclosure . . . ."); *U.S. Steel Corp.*, 730 F.2d at 1467 (claiming that trade-secret information is so potent that "its nature and volume place it beyond the capacity of anyone to retain in a consciously separate category" (internal quotation marks omitted)); *Safe Flight*, 682 F. Supp. at 22 (explicitly crediting Greene as a man of "great moral fiber").

The cases cited by Eagle Labs compelling disclosure arise in different factual contexts. In *Bee Chemical*, the issue was whether the trial judge properly entered an initial order granting the plaintiff access in discovery to defendants' formulas; the alternatives were access or no

access. 253 N.E.2d at 514. By contrast, this case involves the question of redesignation of documents from AEO to confidential under a stipulated order that had been previously entered. There were no tiers of protection involved or available in *Bee Chemical.*

*THK America, Inc.* likewise involved what the terms would be for an initial protective order, not the implementation or modification of a stipulated protected order that had previously been entered. 141 F.R.D. at 462. An American company and its Japanese parent company were suing the defendant for patent infringement. *Id.* There was no dispute that only persons employed by the American company could review the defendant's materials in question. *Id.* The issue was whether persons with a past or present affiliation with the Japanese parent company also could review the materials. *Id.* The court responded by fashioning a protective order that allowed certain key employees of the Japanese parent company also to view the materials because otherwise the litigation would become "one-sided." *Id.*

In two additional cases Eagle Labs cites, the parties were not direct competitors. *See MGP Ingredients, Inc.,* 245 F.R.D. at 502 ("Thus, the risk of anyone abusing his or her knowledge of confidential information appears to be small."); *Medtronic,* 2002 WL 33003691, at *3 ("Finally, unlike many of the cases relied upon by Medtronic, including *Safe Flight,* [defendants] are not directly in competition with Medtronic.").

**C. Did the District Court Abuse Its Discretion?** We now turn to the question of whether the district court abused its discretion in ordering the redesignation of the SOPs from AEO to confidential. Redesignation should not be required merely because Sioux Pharm alleges the SOPs were purloined by Eagle Labs. Sioux Pharm argues it is unsure which specific SOPs were stolen. Sioux Pharm may allege

misappropriation of a collection of trade secrets if it has a good-faith basis for that allegation without 100% certainty as to which specific ones were taken. *See Nike, Inc. v. Enter Play Sports, Inc.*, ___ F.R.D. ___, ___, 2015 WL 1319241, *3–4 (D. Or. March 24, 2015) (declining to require plaintiff to more specifically identify trade secrets allegedly misappropriated by defendant, noting to do so would place plaintiff in a "catch-22" in light of the uncertainty over what defendant actually had taken). A party uncertain whether its trade secret was stolen should not have to reveal the secret to the thief to find out.

Redesignation also should not be ordered merely because Eagle Labs chose not to retain an expert. *See Tailored Lighting, Inc.*, 236 F.R.D. at 149 ("[T]he burden of that cost [of hiring an outside expert] simply does not outweigh the substantial risk of competitive injury that attends disclosure of such trade secret information to the opposing part[ies] . . . ."). At a September 17 hearing, one of the defense counsel said:

> Plaintiffs' position essentially forces us to go out and hire our own expert because only our own expert who is a nonparty under the terms of the protective order can look at AEO materials produced by the Plaintiffs.

At the September 23 hearing, one of the defendants' counsel stated, "Our clients specifically chose not to retain an expert to limit costs in this litigation." Eagle Labs did not argue that experts were unavailable;[5] it simply maintained that for economic reasons as a small company it chose not to hire one. Eagle Labs offered no evidence of what its cost of hiring an expert would be in the context of its overall litigation costs, nor did it disclose anything about its actual financial resources. If

---

[5]Sioux Pharm used an expert who prepared a report following a comparison of both sides' SOPs. This report is part of the record on appeal.

a mere assertion of economic hardship were by itself a sufficient ground for requiring the other side's AEO materials to be reclassified as confidential, AEO status would have little security.

So, the question becomes, what would be a good reason for redesignation. One obvious answer would be when the material does not qualify for AEO treatment under the existing stipulated order because it is not "confidential, non-public, and/or proprietary information containing highly sensitive proprietary, financial, or trade secret information, which would cause severe competitive damage if disclosed to another party to this action."

The parties' stipulated protective order expressly authorizes parties to make an objection to confidential or AEO designation and authorizes the court to resolve the objection, with the burden resting on the party claiming protected status "to defend the appropriateness of the designation."[6] This placement of the burden coincides with the approach courts have generally taken when confronted with blanket protective orders that allow parties unilaterally to designate materials as confidential or AEO. *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 245–46 (S.D.N.Y. 2009) (granting motion to strike confidential designation when party made only minimal showing of economic value and the harm that would result from disclosure and thus failed to meet its burden of showing good cause to keep the documents sealed); *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 416 (E.D.N.Y. 2007) (noting that in challenges to designations under umbrella protective orders, "the burden of establishing that there is good cause to protect the designated materials rests at all times with the party seeking protection"); *In re*

---

[6]Further, the order provides that if the court determines a designation was not made in good faith, it may award sanctions.

*Providian Credit Card Cases*, 116 Cal. Rptr. 2d 833, 840 (Ct. App. 2002) (explaining that party proposing sealing or continuing protective order has the burden of proving the matter is a trade secret in order to overcome the presumption in favor of disclosure).

However, in this case, Eagle Labs did not dispute below that the materials had been properly designated as AEO, and there was evidence in the record (such as the affidavit of Sioux Pharm's president and co-owner) supporting such a designation. Nor does the district court's order indicate that the court found the materials had been misclassified.

As we have already discussed here, and at more length in *Comes*, courts also have the authority to modify stipulated protective orders. In *Comes*, we explained that in deciding whether to modify an order "the court should fully and fairly consider all the circumstances supporting the modification, as well as the circumstances mitigating against it." 775 N.W.2d at 310. Obviously, two salient factors are the need for the defendants personally to have access to the materials to defend properly the plaintiffs' claims and the harm to the plaintiffs that would result from disclosure of the materials to the defendants. Another legitimate consideration, which may have entered into the district court's calculus, was whether the defendants were going to see the plaintiffs' full SOPs anyway when the case went to trial in a few weeks.[7]

---

[7]The stipulated order provides,

This Protective Order does not limit the right of a Party to offer Confidential or Attorneys' Eyes Only information into evidence at hearings or at trial, or to use it for any other lawful hearing or trial purpose including but not limited to impeachment. Any party may move the Court for an Order that the evidence be received *in camera* or under other conditions to prevent unnecessary disclosure.

As we have said, " 'There can be no blinking the fact that there is a strong societal interest in public trials.' " *Iowa Freedom of Info. Council v. Wifvat*, 328 N.W.2d 920, 922–23 (Iowa 1983) (quoting *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383, 99 S. Ct. 2898, 2907, 61 L. Ed. 2d 608, 623 (1979)). Yet, our courts are required to

The problem here is that the party seeking reclassification made only a conclusory argument for doing so, and the court did not set forth its reasoning for ordering reclassification in any detail. The district court cited its own "balancing of the various priorities" and found reclassification "necessary to do justice and to allow the defendants to appropriately understand and prepare their trial defense strategy." This language leaves it unclear whether the court ordered reclassification because it found the SOPs did not meet the protective order's standards for AEO treatment or because it was deciding to modify the protective order. Assuming the latter to be the case, this language also leaves unanswered whether the district court simply agreed with Eagle Labs' *ipse dixit* argument about the unfairness of requiring it to hire an outside expert or whether the court had other, more persuasive grounds for modifying the order.

---

"preserve the secrecy of an alleged trade secret by reasonable means, including but not limited to . . . holding in-camera hearings." Iowa Code § 550.7. Protection of trade secrets at trial is entitled to great weight in this balancing approach. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 600 n.5, 100 S. Ct. 2814, 2840 n.5, 65 L. Ed. 2d 973, 1005 n.5 (1980) (Stewart, J., concurring in judgment).

We have limited access to judicial proceedings in appropriate cases. For example, juvenile court proceedings may be closed to the public upon the motion of any party or on the court's own motion. *See In re A.M.*, 856 N.W.2d 365, 380 (Iowa 2014) (citing Iowa Code § 232.92). Witnesses are routinely sequestered during the testimony of other witnesses under Iowa Rule of Evidence 5.615. In trade-secret litigation, the parties can be excluded from the courtroom when the trade secrets are presented. *See, e.g., Stamicarbon, N.V. v. Am. Cyanamid Co.*, 506 F.2d 532, 542 (2d Cir. 1974) (allowing trade-secrets portion of a trial to be held in camera); *Air Prods. & Chems.*, 442 A.2d at 1129 (allowing counsel and an expert to participate in hearing without the party); *State ex rel. Ampco Metal, Inc. v. O'Neill*, 78 N.W.2d 921, 926–27 (Wis. 1956) (allowing the trade-secrets portion of the trial to proceed in camera). As a commentator observed, "It would be of little practical value to file a lawsuit to protect the confidentiality of a trade secret if the secret became part of the publicly available court record and was thereby lost." 1 Michael D. Scott, *Scott on Computer Information Technology Law* § 6.17, at 6-45 to 6-47 (3d ed. 2015) (also noting court can restrict attendance at trial and seal transcript to protect trade secrets upon a proper showing).

A district court abuses its discretion when it exercises its discretion for reasons that are clearly untenable. *See Mediacom Iowa*, 682 N.W.2d at 66. Here, the party advanced only insufficient grounds for a course of action. Although the record may contain sufficient grounds, the district court did not specify its reasons for acting. In this situation, we are constrained to hold the court abused its discretion. For this reason, we must reverse and remand for further proceedings consistent with this opinion. On remand, the district court should first determine whether the SOPs qualify for AEO status under the protective order (unless Eagle Labs concedes this point). If so, the court should then consider modification. This consideration should be based on the factors outlined in *Comes.* Particular weight should be given to Eagle Labs' need for its own personnel *personally* to have access to Sioux Pharm's SOPs, while recognizing that it is not enough for Eagle Labs simply to argue that its employees need access because it elected not to designate an expert for economic reasons.[8] Weight also must be given to the harm that would befall Sioux Pharm if its SOPs were disclosed to a direct competitor.

In this case, the district court stated that it engaged in a balancing, but did not expressly engage in the analysis of the risk of harm that might be caused by further disclosure or the impact that the failure to allow more disclosure would have on Eagle Labs' ability to litigate. The lack of a more detailed order makes it difficult for this court to engage in meaningful appellate review. *Cf. Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 789 (3d Cir. 1994) (emphasizing that in order "[t]o facilitate effective appellate review of a district court decision of

---

[8]The court can reopen the deadline for expert disclosure if need be.

whether to grant or modify an order of protection or confidentiality, a district court should articulate on the record findings supporting its judgment"); *Mediacom Iowa,* 682 N.W.2d at 68 (finding trial court abused its discretion when it made no factual findings regarding whether information sought constituted trade secrets). On remand, the district court should give due regard to the two competing considerations in this case that drive in the opposite direction.

Our ruling should not be construed as criticism of the district court. From our review of the record, we are impressed by the court's careful, even-handed, hands-on management of the case. At the same time, both in seeking and in opposing the redesignation of Sioux Pharm's SOPs, the parties made generally conclusory arguments. As often happens, the arguments became more focused when the parties got to our court. Nevertheless, in trade-secret litigation between two direct competitors, the stakes are high, and any order regarding the confidentiality status of alleged trade secrets must be carefully drawn. That order should give due account to the terms of the protective order and the considerations set forth in *Comes.*

## IV. Disposition.

For these reasons, we reverse the district court's orders of September 23 and 30, 2013. We remand the case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

All justices concur except Appel and Wiggins, JJ., who concur specially, and Hecht, J., who takes no part.

#13–1525, *Sioux Pharm, Inc. v. Eagle Labs., Inc.*

**APPEL, Justice (concurring specially).**

I concur with the court's opinion.

On remand, the district court should give due regard to the two competing considerations in this case which drive in opposite directions: the risk of harm to Sioux Pharm that might be caused by additional disclosures and Eagle Labs' need for further disclosure to effectively defend its interests in the litigation.

As pointed out by the court, the district court and the parties on remand should avoid generalizations in favor of specific evidentiary showings and articulated reasoning. To some extent, the shortcomings in the district court's order may have been a result of sequencing. At this stage of the litigation, the trade secrets of the parties should be identified with particularity first, with consideration of further disclosure occurring after such identification has been made. Without identification of the underlying trade secrets, the district court is not in the best position to do the necessary balancing on a particularized basis. *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1131 (9th Cir. 2003) (stating the party asserting confidentiality bears the burden of showing that specific prejudice or harm will result for each particular document it seeks to protect); *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 547–48 (7th Cir. 2002) (denying confidentiality where parties failed to show what specifically was confidential and give reasons why confidential treatment should be accorded).

The district court in this case, however, ordered Sioux Pharm to identify with particularity its Standard Operating Procedures (SOPs) that Eagle Labs allegedly misappropriated. If Sioux Pharm complies with this order first, the district court will then be in a better position to examine

each identified SOP that is allegedly a trade secret misappropriated by Eagle Labs (and any other documents for which disclosure is sought) and make the necessary particularized findings with respect to the balancing of the parties' competing interests.

Wiggins, J., joins this special concurrence.